VERMONT *v.* NEW YORK ET AL.

No. 50, Orig.   Decided June 3, 1974

PER CURIAM.

On April 24, 1972, after oral argument, we granted Vermont's motion to file a bill of complaint against New York and the International Paper Co. which alleged that as a result of discharge of wastes, largely from International's mills, that company and New York are responsible for a sludge bed in Lake Champlain and Ticonderoga Creek that has polluted the water, impeded navigation, and constituted a public nuisance.   406 U. S. 186.   Issue was joined and the Honorable R. Ammi Cutter was appointed Special Master.   408 U. S. 917.   Later the United States sought leave to intervene, stating it had numerous interests in these waters under federal statutes. We referred the motion to the Special Master, 409 U. S. 1103, who granted intervention.   During the year 1973, 75 days of testimony were received, Vermont presenting

substantially all of its direct case.    New York has put in about half of its direct case.    Neither International nor the United States up to now has offered any evidence.

The Report of the Special Master dated April 24, 1974, states that he suggested that the parties might adjust their differences less expensively than by litigation.    He reports that the United States succeeded in bringing about serious negotiations which resulted in a settlement that the Special Master commends to the Court for approval. The proposed settlement is represented by a Proposed Consent Decree and a stipulation that the Decree may be entered by the Court without further argument or hearing.

The settlement "contemplates that no findings shall be made" and it provides that "it shall not constitute an adjudication on any issue of fact or law, or evidence, or any admission by any party with respect to any such issue."    The Special Master reports, "In my opinion, no settlement would be possible if this report were to contain any findings."    He adds that in his opinion "it reaches a reasonable result, consistent with the public interest, and acceptable on the basis of the evidence thus far presented."

By Art. I of the Decree a special South Lake Master [1] is to be appointed with all the usual powers of Special Masters named by us.    He is to resolve matters of controversy between the parties after they have exhausted all administrative and other remedies (except judicial review).    When he has decided the matter, he will file his recommendation with the Clerk of the Court.    Unless any party "aggrieved" files exceptions with the Court within 30 days, it becomes a decision of the Court "unless

---

[1] South Lake Champlain "means that portion of Lake Champlain extending from Whitehall, New York, to the Lake Champlain Bridge near Crown Point, New York."    Proposed Decree, Art. II (I).

disapproved by the Court." Proposed Decree, Schedule 1, § 1.6. But nothing in Schedule 1 limits any regulatory or law enforcement authority "with lawful jurisdiction independently to carry out or enforce applicable law and regulations."

After nine years from our approval of the Decree, the South Lake Master on application for modification of it may submit his recommendations to the Court without prior exhaustion of administrative remedies before the federal and New York authorities or after such exhaustion, as he chooses.

The South Lake Master may order International to permit inspection of Old Mill [2] or New Mill [3] on showing of good cause. Schedule 1, § 1.7.

Schedule 2 of the Proposed Decree provides for grading and covering the bark pile near Old Mill and for lowering the water level in an adjacent pond to reduce the drainage of the bark pile into Ticonderoga or tributaries.

Schedule 3 prescribes methods of control of malodorous air emissions from New Mill; and Schedule 1, § 1.5 (b), provides that notwithstanding the provisions of Schedule 3, if, after November 1, 1975, objectionable odors attributable to New Mill are detected in Vermont "during a significant period of time," the South Lake Master may recommend "other or further action or relief."

Within 30 days after approval of the Proposed Decree, International shall submit an emergency report "for a conceptual plan" to modify the air emission controls specified in Schedule 3 and, if approved by New York, the new equipment and materials for the facilities shall be completed and in operation no later than November 1, 1975. Schedule 3, § 3.2 (c)(7).

---

[2] Old Mill is located in the village of Ticonderoga and was long operated as a pulp and paper mill.

[3] New Mill is located four miles north of that village.

Schedule 3, § 3.3, states the volume of Total Reduced Sulfur (TRS) from International's "recovery boiler" once the Proposed Decree is approved. Section 3.4 (a) states the standard for emissions of TRS from the lime kiln and § 3.4 (b), the amount of sodium hydroxide in the scrubbing solution in the lime kiln scrubber.

Schedule 4 covers the water discharge from New Mill. It specifies in § 4.1 (a) that the amount of $BOD_5$[4] in the waste water will not exceed 4400 pounds per day as a monthly average. Section 4.1 (b) specifies the maximum total phosphorus in the process waste-water effluent. Section 4.2 provides that the effluent will be considered toxic, if over a 96-hour period, 20% of the test fish (yellow perch) fail to survive in a solution composed of 65% process waste-water effluent and 35% Lake Champlain water.

Sections 4.3 and 4.4 provide clinical and other water tests for International to make at stated intervals.

Appendix A "delivered pursuant to the command of the Supreme Court of the United States" is a release of International by Vermont of all damages past, present, and future caused (1) by the accumulation of sediment in Ticonderoga Creek and the Ticonderoga Bay area of the lake; (2) by the discharge of waters from Old Mill prior to the date of entry of the decree; (3) by air emissions from Old Mill prior to such date; and (4) by air emissions from New Mill prior to that date.

Appendix B states the position of the United States that it is not in the public interest to remove the sludge deposits and that dredging them is not justified.

Appendix C is a release of International by the United States from all liability for the accumulation of sediment

---

[4] This is the five-day biochemical oxygen demand of the process waste-water effluent as measured by a specified method.

in Ticonderoga Creek and the Ticonderoga Bay area because of past waste discharges, save for costs arising out of remedial action taken as a consequence of "the needs of anchorage or navigation."

The Special Master has done a very difficult task well and with distinction; we are indeed grateful for the professional services he has rendered. But we have concluded not to approve the Proposed Decree or appoint a South Lake Master.

I

In *Wisconsin* v. *Illinois,* 281 U.S. 696, the Court on the report of a Special Master enjoined the Sanitary District of Chicago from withdrawing through the Chicago drainage canal more than a stated number of cubic feet of water per second. That was on April 21, 1930. On May 22, 1933, on application of the States for a "commissioner or special officer" to execute the decree, the Court ordered Illinois to take certain steps respecting the diversion, but it denied the request to appoint the commissioner. 289 U. S. 710, 711.

*Wyoming* v. *Colorado,* 259 U. S. 419, 260 U. S. 1, involved an allocation of the waters of the Laramie River. The parties were once more before the Court in 1936, 298 U. S. 573. This time the Court entered an injunction against continuing diversions contrary to the prior decrees, *id.,* at 582–583. The Court refused to order measuring devices at places of diversion or to *appoint a water master to keep the records,* the Court saying, "While the problem of measuring and recording the diversions is a difficult one, we entertain the hope that the two States will by cooperative efforts accomplish a satisfactory solution of it." *Id.,* at 586. In time the two States, policing themselves, resolved the controversy, 309 U. S. 572.

We noted in *Nebraska* v. *Wyoming,* 325 U. S. 589, 616,

that continuing Court supervision over decrees of equitable apportionment of waters was undesirable.

*New Jersey* v. *New York*, 283 U. S. 805, is not an exception. It involved a dispute between New Jersey, New York, New York City, and Pennsylvania over the waters of the Delaware River. The decree was an equitable apportionment of the water coupled with protective provisions, *first,* for a sewage disposal plant at Port Jervis, New York, that met prescribed cleansing standards; *second,* the banning of the discharge of untreated industrial wastes into the Delaware and Neversink Rivers; and *third,* the treatment of industrial wastes practically to free them "from suspended matter and [to render them] nonputrescent." *Ibid.* That decree, entered May 25, 1931, was modified June 7, 1954, 347 U. S. 995, when a Special Master's Report was approved. The prior equitable apportionment was altered, and new and somewhat different formulae to measure and control the diversions were provided. A River Master was to be selected by the Chief Hydraulic Engineer of the U. S. Geological Survey to administer the decree. *Id.,* at 1002. He was authorized to measure the actual diversions, *ibid.,* compile data, collect and correlate stream-flow gauging, make periodic reports, and make designated changes in the volume of daily releases, *id.,* at 1003.

But it is a rare case where we have appointed a Water Master. The one appointed in *New Jersey* v. *New York* was given only ministerial acts to perform, such as reading gauges and measuring the flow. In that case (1) the rights of the parties to the water had been determined by the Court and (2) the sewage and industrial waste problems had been adjudicated and resolved.[5] All that

---

[5] Pollution of interstate waters raises questions in the area of the law of public nuisance as we recently noted in *Illinois* v. *City of Milwaukee,* 406 U. S. 91, 106–107.

remained was to supervise the application of the various formulae which the Court had decreed, based on findings of fact.

*Wisconsin* v. *Illinois,* 281 U. S. 179, involved the use of Lake Michigan waters by a sanitary district in Illinois to operate sewage treatment plants. The Court had ordered Illinois to restrict its use of Lake Michigan waters and to build certain facilities to allow treatment without the use of a great deal of lake waters. Illinois was given certain timetables for completion of the new facilities. The Special Master recommended either the appointment of a commission to supervise the construction or the filing of progress reports by the sanitary commission with the Clerk of this Court. The Court chose the option of not appointing a commission, and instead ordered the district to file semi-annual compliance reports with the Court. Masters were appointed at several points in this litigation for specific short-term purposes, but no quasi-permanent master to oversee general compliance was appointed. After the district was ordered to construct the facilities, Illinois impeded progress by withholding necessary state funds. The parties asked for a master to police compliance with the decree. The Court appointed a Master to investigate but he was relieved after the receipt of his report. Illinois was ordered to supply the necessary funds and to report its compliance with the Clerk of the Court. 289 U. S. 395, 411–412.

In the instant case no findings of fact have been made; nor has any ruling been resolved concerning either equitable apportionment of the water involved or the questions relative to whether New York and International are responsible for the creation of a public nuisance as alleged by Vermont.[6]

---

[6] Vermont also alleges that the deposit of sludge has caused a shift of the channel (the border between the two States) in New

The proposed South Lake Master would police the execution of the settlement set forth in the Decree and pass on to this Court his proposed resolution of contested issues that the future might bring forth. Such a procedue would materially change the function of the Court in these interstate contests. Insofar as we would be supervising the execution of the Consent Decree, we would be acting more in an arbitral rather than a judicial manner. Our original jurisdiction heretofore has been deemed to extend to adjudications of controversies between States according to principles of law, some drawn from the international field, some expressing a "common law" formulated over the decades by this Court.

The proposals submitted by the South Lake Master to this Court might be proposals having no relation to law. Like the present Decree they might be mere settlements by the parties acting under compulsions and motives that have no relation to performance of our Art. III functions. Article III speaks of the "judicial power" of this Court, which embraces application of principles of law or equity to facts, distilled by hearings or by stipulations. Nothing in the Proposed Decree nor in the mandate to be given the South Lake Master speaks in terms of "judicial power."

## II

The parties have available other and perhaps more appropriate means of reaching the results desired under the Proposed Court Decree. An interstate compact under Art. I, § 10, cl. 3, is a possible solution of the conflict here. Vermont and New York (along with Connecticut, Maine,

York's favor. Disputes over interstate boundaries are properly cognizable here. *Michigan* v. *Wisconsin*, 270 U. S. 295; *Massachusetts* v. *New York*, 271 U. S. 65.

Massachusetts, New Hampshire, and Rhode Island) are already parties to the New England Interstate Water Pollution Control Compact, 61 Stat. 682 (1947).

A settlement of this interstate dispute by agreement of the parties is another alternative. Once a consensus is reached there is no reason, absent a conflict with an interstate compact, why such a settlement would not be binding. And such a settlement might be the basis for a motion to dismiss the complaint. Cf. *Missouri* v. *Nebraska, post,* p. 904..

*So ordered.*