# NEW HAMPSHIRE *v.* MAINE

No. 64, Orig.   Argued April 19, 1976—Decided June 14, 1976

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, MARSHALL, POWELL, and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting opinion, in which BLACKMUN and STEVENS, JJ., joined, *post,* p. 370.

*Richard F. Upton* argued the cause for plaintiff on exceptions to the Report of the Special Master. With him on the briefs were *Warren B. Rudman,* Attorney General of New Hampshire, and *David H. Souter,* Deputy Attorney General.

*Edward F. Bradley, Jr.,* Assistant Attorney General of Maine, argued the cause for defendant on exceptions to the Report. With him on the briefs were *Joseph E. Brennan,* Attorney General, and *Donald G. Alexander* and *Robert J. Stolt,* Assistant Attorneys General.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Both New Hampshire and Maine have filed exceptions to the Report of the Special Master in this original action brought by New Hampshire against Maine, 414 U. S. 810, 996 (1973), to locate the lateral marine boundary separating the States between the mouth of Portsmouth Harbor and the entrance to Gosport Harbor in the Isles of Shoals.[1] Prior to trial the At-

---

*\*Stephen R. Katz* filed a brief for the New Hampshire Commercial Fishermen's Assn. as *amicus curiae.*

[1] The controversy arose out of a dispute over lobster fishing in the seabed. Maine's regulatory laws, if applicable, are more restrictive than those of New Hampshire. For example, Maine requires a license, available only to Maine residents, for the taking

torneys General of New Hampshire and Maine agreed upon a settlement and jointly filed a "Motion for Entry of Judgment by Consent of Plaintiff and Defendant," together with a proposed consent decree, based on a stipulated record.[2] The Special Master thereafter, without further hearing but with supplemental briefs, declared the entire case, including the proposed consent decree, to be under submission.

The Special Master "concluded that the proposed consent decree should be submitted to the Court for its consideration," Report of Special Master 3, but expressed the view that rejection of the decree must be recommended as not permissible under the principle of *Vermont* v. *New York,* 417 U. S. 270, 277 (1974), that "mere settlements by the parties acting under compulsions and motives that have no relation to performance of [the Court's] Art. III functions" do not relieve the Court of its constitutional duty to decide the merits of the controversy between the States. However, the Special Master recommended entry of the consent decree if its entry would be consistent with performance of the Court's Art. III function.[3] We hold that entry of the

of lobsters in Maine waters. Me. Rev. Stat. Ann. tit. 12, § 4404 (Supp. 1975–1976). Maine also imposes stricter minimum- and maximum-size requirements. Compare Me. Rev. Stat. Ann. tit. 12, § 4451 (1964), with N. H. Rev. Stat. Ann. § 211:27 (Supp. 1975). Before the original action was filed, efforts to settle the dispute failed, and violence over lobster fishing rights in the area was threatened.

[2] A motion to intervene on behalf of the New Hampshire Commercial Fishermen's Association was denied by the Special Master, but leave to proceed as *amicus curiae* was granted.

[3] As noted by the Special Master, a resolution of the New Hampshire Legislature supported a different marine boundary. The joint motion in support of the consent decree states as follows:

"Counsel assure the Court that the requested disposition of this action has been fully explained to the Governor and Executive Coun-

consent decree is consistent with that function. We therefore sustain Maine's exception to the rejection of the proposed consent decree. Accordingly, we have no occasion to address the other exceptions filed by the States.

The boundary in dispute was in fact fixed in 1740 by decree of King George II of England. That decree set the boundary as follows:

> "That the Dividing Line shall pass up thro the Mouth of Piscataqua Harbour and up the Middle of the River . . . . And that the Dividing Line shall part the Isles of Shoals and run thro the Middle of the Harbour between the Islands to the Sea on the Southerly Side. . . ."

The historical events that produced this 1740 decree, summarized briefly here, are detailed in the Special Master's Report. In the early 18th century, a major boundary dispute arose between the provinces of New Hampshire and Massachusetts regarding the southern border of New Hampshire. The legal issues focused on the Merrimack River, but the boundary between New Hampshire and the Maine portion of Massachusetts was also involved. When representatives of the two provinces were unable in 1731 to reach agreement, the New Hampshire representatives presented the matter to King George II. The King referred the dispute to the Board of Trade, which in 1735 recommended that commissioners from the other New England Colonies be designated to resolve the question. In 1737 the King ac-

---

cil of each State by its Counsel and that the Governor and Executive Council of each State approve the requested disposition of this action."

No contention has been made that under New Hampshire law legislative approval or disapproval renders the New Hampshire consent ineffective.

cordingly appointed 20 members of the Provincial Councils of New York, New Jersey, Rhode Island, and Nova Scotia to serve as commissioners. Although much of the debate related only to the Merrimack question, the Piscataqua boundary between Maine and New Hampshire was also a point of controversy. The commission rendered its decision later that year, but both provinces appealed the decision to the King. In 1738 the King referred the matter to the Lords of the Committee of the Privy Council for Hearing Appeals from the Plantations, which recommended acceptance of the commission's resolution without change. In 1740 King George II signed a decree accepting this recommendation and, employing the quoted language, thereby permanently fixed the Maine-New Hampshire boundary. This boundary was the fixed boundary when the Union, including Massachusetts and New Hampshire, was formed, and when Maine was formally separated from Massachusetts and admitted to the Union.

The States expressly agree with the conclusion of the Special Master that "the decree of 1740 fixed the boundary in the Piscataqua Harbor area." Their quarrel was over the location by the decree of the "Mouth of Piscataqua River," "Middle of the River," and "Middle of the Harbour" within the contemplation of the decree. The proposed consent decree embodies the States' agreement upon the meaning of those terms, and we hold that the Court may give effect to the States' agreement consistently with performance of our Art. III function and duty.

The Special Master found that a "case or controversy" existed when this original action was filed, but that the effect of the compromise represented by the joint motion for entry of the consent decree was that "[a]t this point in time . . . the moving papers do not propose a case or

controversy in which the Court might apply 'principles of law or equity to the facts, distilled by hearings or stipulations.' [*Vermont* v. *New York, supra*, at 277.]" Report of Special Master 3–4. This was true of the circumstances before the Court in *Vermont* v. *New York,* but it is not true of the circumstances before the Court in this case.

The proposed consent decree in *Vermont* provided that "no findings shall be made" and that "it shall not constitute an adjudication on any issue of fact or law, or evidence, or any admission by any party with respect to any such issue." 417 U. S., at 271. The decree also provided for appointment by the Court of a Special Master authorized to consider all future disputes, after exhaustion of administrative and other remedies, and to file recommendations with the Court; these recommendations were to become decisions of the Court unless disapproved. Obviously this proposal "would materially change the function of the Court in these interstate contests." *Id.,* at 277. If we were to agree to police prospectively the conduct of the parties, "we would be acting more in an arbitral rather than a judicial manner." *Ibid.*

In contrast, the 1740 decree, not the proposed consent decree, permanently fixed the boundary between the States; the proposed consent decree does nothing except record the States' agreement upon the location of the "Mouth of Piscataqua River," "Middle of the River," and "Middle of the Harbour" within the contemplation of the 1740 decree. The consent decree expressly states that it "determines the lateral marine boundary line between New Hampshire and Maine from the inner Portsmouth Harbor to the breakwater at the end of the inner Gosport Harbor in the Isles of Shoals."

The consent decree therefore proposes a wholly permissible final resolution of the controversy both as to

facts and law. Nothing remotely resembling "arbitral" rather than "judicial" functions is involved, unlike the proposed consent decree in *Vermont* v. *New York*. Moreover, there is nothing to suggest that the location of the 1740 boundary agreed upon by the States is wholly contrary to relevant evidence, and we therefore see no reason not to give it effect, even if we would reach a different conclusion upon the same evidence. The nature of the dispute is such that the States' resolution of it does not fall into the category of agreements that we reject because acceptance would not be consistent with our Art. III function and duty. *Vermont* v. *New York* does not proscribe the acceptance of settlements between the States that merely have the effect, as here, of reasonably investing imprecise terms with definitions that give effect to a decree that permanently fixed the boundary between the States.

New Hampshire suggests, however, that acceptance of the consent decree without an independent determination by the Court as to the validity of the legal principles on which it is based would be a circumvention of the Compact Clause, Art. I, § 10, cl. 3. The premise of this argument is that the proposed settlement is an "Agreement or Compact" within the meaning of the Clause and thus requires the consent of Congress to be effective. We disagree.

The application of the Compact Clause is limited to agreements that are "directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States." *Virginia* v. *Tennessee*, 148 U. S. 503, 519 (1893). Whether a particular agreement respecting boundaries is within the Clause will depend on whether "the establishment of the boundary line may lead or not to the increase of the political power or influence of the States affected,

and thus encroach or not upon the full and free exercise of Federal authority." *Id.,* at 520. See *Wharton* v. *Wise,* 153 U. S. 155, 168–171 (1894).

The proposed consent decree plainly falls without the Compact Clause under this test. New Hampshire and Maine are not here adjusting the boundary between them; the boundary was fixed over two centuries ago by the 1740 decree, and the consent decree is directed simply to locating precisely this already existing boundary. Accordingly, neither State can be viewed as enhancing its power in any sense that threatens the supremacy of the Federal Government. The boundary defined by the proposed decree "takes effect, not as an alienation of territory, but as a definition of the true and ancient boundary." *Virginia* v. *Tennessee, supra,* at 522. See *North Carolina* v. *Tennessee,* 235 U. S. 1, 15–16 (1914).

The proposed consent decree will be entered.

*So ordered.*

Mr. Justice White, with whom Mr. Justice Blackmun and Mr. Justice Stevens join, dissenting.

I find unacceptable the Court's cursory conclusion that the Special Master and we ourselves are bound to accept the agreement of the parties as to the meaning of the words "middle of the river" and related phrases which were used in the 1740 document to describe the Maine-New Hampshire boundaries, as well as their agreement as to where that line lies on the face of the earth.

The parties interpret "middle of the river" as meaning the thalweg, which they understand to be the middle of the main channel of navigation. The States then fashioned their mutually agreed boundary in the river and the harbor on this basis, their boundary in the ocean being a straight line between the points at which the main navigation channels cross the closing lines of

Portsmouth and Gosport Harbors. No inquiry is made, however, by either the Court or the parties as to whether the "middle of the river" has, or had, any commonly understood meaning in the law. The Special Master concluded that these words, when used in 1740, intended to describe the geographic middle of the river—a line all points of which were equidistant from the nearest points on the shores. This was the meaning given to very similar words in *Texas* v. *Louisiana,* 410 U. S. 702 (1973); and it seems incredible to me that however correct the Special Master may be in this regard—and the Court does not even imply that he is wrong—he must nevertheless accept the parties' agreement that the middle of the river is the middle of the main channel of navigation.

The Court's holding seems to be that *whatever* the parties might agree to with respect to the import of the 1740 language, the Special Master and the courts must give their imprimatur. As I understand the Court, the stipulation would have been just as acceptable and just as binding upon us if the parties had agreed that the middle of the river was intended to mean the geographical center of the stream.

I agree with the contrary view of the Special Master that the middle-of-the-river language should be determined in accordance with legal principles, not by agreements of convenience. The Special Master concluded that when the language involved was employed in 1740 the geographic middle rather than the thalweg or main channel of the river was intended. The Court does not hold the Special Master to be wrong in this regard, and it would be difficult to believe that the "middle of the river" should be determined by what the main channel of navigation might turn out to be in the 1970's.

The parties agree that the geographic middle and the main channel of navigation are totally different concepts.

The map filed by the State of Maine in connection with its exceptions indicates the great difference it makes whether the stipulated boundary or the geographic middle is to rule this case. The State strongly objects to the latter because substantial areas both in the river and harbor and seaward would be lost to its neighbor, New Hampshire.

Furthermore, whether the middle of the river is to mean the thalweg or a line equidistant from the shores, the boundary should be laid out in accordance with the legal import of these concepts. This does not seem to be the case with respect to the stipulated boundary in the Piscataqua River and Portsmouth Harbor; for the agreed boundary proceeds on absolutely straight lines, and it is incredible that a line following the main or deepest channel would proceed on such an invariable course. What the parties have actually done is to agree upon a line which they assert represents the course most usually followed by those navigating the harbor and the river. This is not at all the same thing as a boundary following the thalweg.

I would not think that without the consent of Congress two States could agree to locate the boundary between them on either shore of the river separating them if the controlling document describes their boundary as the middle of the river; nor, if the document made it plain that the main channel in the river was their boundary line, would they be free to stipulate that the boundary should be the geographic center of the stream nor should a court approve any such stipulation. Rather it should determine and lay out the line in accordance with accepted legal principles and enter a decree accordingly. This is what the Special Master recommended that we do, and his Report should be accepted and a decree entered in accordance therewith.