TAXPAYERS OF MICHIGAN AGAINST CASINOS v STATE OF MICHIGAN

Docket Nos. 225017, 225066. Submitted August 13, 2002, at Lansing.
Decided November 12, 2002, at 9:00 A.M. Leave to appeal sought.

Taxpayers of Michigan Against Casinos and State Representative Laura Baird brought an action in the Ingham Circuit Court against the state of Michigan to challenge the constitutionality of compacts between the state and Indian tribes concerning class III casino gaming on tribal lands in Michigan. The compacts were negotiated by the Governor on behalf of the state, were concluded pursuant to the Indian Gaming Regulatory Act (IGRA), 25 USC 2701 *et seq.*, and were approved by the Michigan House of Representatives and Senate by joint resolution. Gaming Entertainment, LLC, which serves as a consultant to Indian tribes that operate casinos, was allowed to intervene as a defendant. The court, Peter D. Houk, J., ruled that legislative approval of the compacts by resolution rather than by legislation violated Const 1963, art 4, § 22 (which provides that all legislation shall be by bill), art 3, § 2 (separation of powers), but not art 4, § 29 (the Legislature shall pass no local or special act in any case where a general act can be made applicable). The defendants appealed separately, the plaintiffs cross appealed, and the appeals were consolidated.

The Court of Appeals *held*:

1. The federal Compact Clause, US Const, art I, § 10, cl 3, which provides that no state, without the consent of Congress, shall enter into any agreement or compact with another state or foreign power, is limited in application to agreements that are directed to the formation of any combination tending to increase the political powers in the states, which encroach upon or interfere with the just supremacy of the United States. The lack of congressional approval of the compacts at issue in this case is of no moment, given that the compacts did not aggrandize the state's power to the detriment of the United States in light of the fact that the compacts did not provide the state with any authority to enforce the provisions of the compacts, leaving the resolution of disputes to the parties and to arbitration.

2. The Governor has authority to negotiate and enter into a compact with an Indian tribe under the IGRA. Const 1963, art 5, § 17

authorizes the Governor to present and recommend legislation. There is no prohibition in Michigan law that would bar the Governor's actions in negotiating a gaming compact and then presenting it to the Legislature for its approval.

3. Legislative approval of the compacts by joint resolution rather than by bill enactment does not violate Const 1963, art 4, § 22. Under the IGRA, states that, like Michigan, permit gaming activities under their regulation may not prohibit such activities on Indian lands and must enter into compacts with Indian tribes that seek to conduct such activities on their lands. The constitutional challenge is also precluded by the state's inability to enforce the terms of the compacts. The Legislature has a prior course of conduct of approving compacts by resolution.

4. The issue whether the separation of powers doctrine is violated by provisions in the compacts that allow the Governor to amend the compacts without legislative approval is not ripe for review. No amendment has been requested or made in this manner.

5. Const 1963, art 4, § 29 was not violated by the compacts. The state has no authority to regulate conduct on Indian tribal lands. While non-Indian areas surrounding the Indian casinos may be affected, the IGRA provides that Indian tribes may operate casinos on tribal lands.

Affirmed in part and reversed in part.

INDIANS — CASINOS — TRIBAL-STATE GAMING COMPACTS — CONSTITUTIONAL LAW.

Negotiation by the Governor and approval by joint resolution of the Legislature of a compact with an Indian tribe for the operation of casino gambling on tribal land within the state does not violate state constitutional provisions requiring legislation by bill and prohibiting local or special acts where a general act can be made applicable (Const 1963, art 4, §§ 22, 29; 25 USC 2701 *et seq.*).

*Warner Norcross & Judd LLP* (by *Robert J. Jonker, William C. Fulkerson,* and *Daniel K. DeWitt*) for Taxpayers of Michigan Against Casinos and State Representative Laura Baird.

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Barris, Sott, Denn & Driker, P.L.L.C.* (by *Eugene Driker, Leon S. Cohan, Morley Witus,* and *Thomas F. Cavalier*), Special Assistant Attorneys General, for the state of Michigan.

*Dickinson Wright PLLC* (by *Peter H. Ellsworth* and *Jeffery V. Stuckey*) and *Dykema Gossett PLLC* (by *Richard D. McLellan, Bruce G. Davis*, and *Robert M. Horwitz*) for Gaming Entertainment, LLC.

Amici Curiae:

*Kimbal R. Smith, III*, for Senators George A. McManus, Jr., and Harry Gast, Jr., and House Speaker Charles Perricone.

Before: HOOD, P.J., and HOLBROOK, JR., and OWENS, JJ.

HOOD, P.J. Defendant, state of Michigan, appeals as of right from the trial court's determination that legislative approval, by resolution, of compacts allowing operation of casinos by Indian tribes violated provisions of the Michigan Constitution.[1] We affirm in part and reverse in part.

In 1997 and 1998, Governor John Engler negotiated compacts with four Indian tribes[2] to permit class III

---

[1] Following the hearing regarding cross-motions for summary disposition, the trial court granted in part and denied in part each motion. Specifically, the trial court held that approval of the compacts by joint resolution violated Const 1963, art 4, § 22, requiring that all legislation shall be passed by bill. Additionally, the trial court held that Const 1963, art 3, § 2, governing separation of powers, was violated because of the Governor's authority to amend the compacts. Lastly, the trial court held that Const 1963, art 4, § 29, requiring that all local measures be approved by two-thirds of the members of each house and a majority of electors voting in the affected district, was inapplicable.

[2] The tribes involved are the Little River Band of Ottawa Indians, the band described in the compacts as the Pokagon Band of Ottawa Tribe and in the briefs as the Pokagon Band of Potawatomi Indians, the Little Traverse Bay Bands of Odawa Indians, and the Nottawaseppi Huron Potawatomi. In order to facilitate establishment of a casino, Indian tribes frequently retain consultants. Intervening defendants North American Sports Management Company, Inc., IV (dismissed from the action on August 12, 2002), and Gaming Entertainment, LLC, are consultants that provide financial and other support to Indian tribes that open and operate casinos.

gaming by the tribes on eligible Indian lands in Michigan. The terms of the compacts contained various regulatory provisions. The tribes agreed to hiring criteria for their employees and management and agreed to provide benefits and disability compensation in conformance with Michigan law. The tribes also agreed to a minimum age requirement of eighteen years for participation in any class III game. The tribes adopted Michigan law regarding the sale and regulation of alcoholic beverages. Compact provisions addressed revenue payments to the state and to local governments and the creation of an oversight body to address the manner of distribution of revenues. However, the compacts did not provide the state with any authority to enforce the provisions of the compacts. Rather, they provided that representatives of the tribes and the state would meet to resolve any dispute regarding alleged noncompliance. If resolution could not be reached, the matter would be submitted to arbitration. The compacts provided that the Governor would endorse the compacts and concurrence in that endorsement by the Michigan Legislature would occur by "resolution." The governor had the ability to receive and agree to any amendments of the compacts.

A bill becomes law when it has the concurrence of a majority of members elected to and serving in each house. Const 1963, art 4, § 26. However, the approval of the compacts was submitted to the Legislature through the joint resolution process that required only a majority of voting members. The Legislature approved the compacts by a majority of voting members. House Concurrent Resolution No. 115 (Decem-

ber 10, 1998). The manner of approval of the compacts is challenged in this appeal.

### I. THE ORIGINS OF FEDERAL AUTHORIZATION FOR OPERATION OF CASINOS

In *California v Cabazon Band of Mission Indians*, 480 US 202, 204-207; 107 S Ct 1083; 94 L Ed 2d 244 (1987), two federally recognized Indian tribes conducted bingo games on their reservations pursuant to an ordinance approved by the Secretary of the Interior. Other card games, including draw poker, were also played at the facility. The games were open to the general public and were played predominantly by non-Indians who came onto the Indian reservation. The games were the primary source of employment for tribal members, and the profits were the sole source of tribal income. The state of California sought to apply provisions of its penal code to preclude the gambling activity. California law permitted bingo games, as long as the games were staffed and operated by members of a designated charitable organization who were not paid for their services. Profits could only be utilized for charitable purposes, and prizes were limited to a nominal amount. The state sought to enforce these restrictions on the Indian reservations. The tribes sued in federal court for a declaration that state ordinances could not be applied against the reservation and for an injunction against any enforcement. *Id.*

The Supreme Court held that state jurisdiction over the tribes could only occur under limited circumstances:

The Court has consistently recognized that Indian tribes retain "attributes of sovereignty over both their members and their territory," and that "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States," . . . . It is clear, however, that state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided. [*Id.* at 207 (citations omitted).]

The state alleged that congressional authority was granted by 18 USC 1162, a statute granting broad criminal jurisdiction and limited civil jurisdiction to six states, including California, over specified areas of Indian country, and by the Organized Crime Control Act (OCCA), 18 USC 1955. However, the United States Supreme Court concluded that congressional law neither permitted regulation nor precluded operation of the gaming activities conducted by the Indian tribes. Specifically, the Court noted that California law did not ban all forms of gambling. The state itself operated a state lottery and encouraged its citizens to participate in this state-run gambling. Additionally, the state allowed pari-mutuel horse-race betting, and more than four hundred card rooms similar to the card rooms operated by the tribes were active in the state. When state law permitted conduct, subject to regulation, it was civil regulatory law, and federal statutes did not authorize enforcement on an Indian reservation. Thus, in light of the substantial amount of gambling activity permitted and the state's active operation of a state lottery, the Supreme Court concluded that California regulated rather than prohibited gambling in general and bingo in particular. Therefore, the state could not interfere with this permitted conduct that occurred on an Indian reservation. *Cabazon, supra* at 207-214.

The United States Supreme Court then analyzed the burden on Indian tribes when the state sought to regulate the dealings of non-Indians participating in bingo games on Indian reservations. The United States Supreme Court held that state jurisdiction was preempted if it interfered with or was incompatible with federal and tribal interests reflected in tribal law. Throughout history the congressional goal was to allow Indians self-government, including self-sufficiency and economic development. After examining the congressional laws and policies designed to achieve this goal by allowing tribal bingo enterprises, the United States Supreme Court stated:

> These policies and actions, which demonstrate the Government's approval and active promotion of tribal bingo enterprises, are of particular relevance in this case. The Cabazon and Morongo Reservations contain no natural resources which can be exploited. The tribal games at present provide the sole source of revenues for the operation of the tribal governments and the provision of tribal services. They are also the major sources of employment on the reservations. Self-determination and economic development are not within reach if the Tribes cannot raise revenues and provide employment for their members. The Tribes' interests obviously parallel the federal interests.
>
> *              *              *
>
> We conclude that the State's interest in preventing the infiltration of the tribal bingo enterprises by organized crime does not justify state regulation of the tribal bingo enterprises in light of the compelling federal and tribal interests supporting them. State regulation would impermissibly infringe on tribal government, and this conclusion applies equally to the county's attempted regulation of the Cabazon card club. We therefore affirm the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion. [*Id.* 218-222.]

In response to the *Cabazon* decision, Congress enacted the Indian Gaming Regulatory Act (IGRA), 25 USC 2701 *et seq.* This act explicitly authorizes licensed gaming activities on Indian lands by Indian tribes to generate tribal revenue, 25 USC 2701(1), and promote the goals of tribal economic development and self-sufficiency, 25 USC 2701(4). The regulation of gaming activity on Indian lands is exclusively the province of the Indian tribes. 25 USC 2701(5). The operation of gaming activity by Indian tribes is permitted within a state that does not as a matter of law and public policy prohibit such gaming activity. *Id.* Class III gaming activities[3] are lawful on Indian lands only if the activities are authorized by ordinance or resolution and conducted in conformance with a tribal-state compact entered into between a tribe and a state. 25 USC 2710(d)(1)(A),(C). Upon receiving a request to enter into negotiations to complete a compact, the state "shall negotiate" in good faith to enter into such a compact. 25 USC 2701(d)(3)(A). While the compact "may" include provisions addressing application of criminal and civil law, allocation of criminal and civil jurisdiction, cost allocation, taxation, remedies for breach of contract, and operation standards, there is no provision for enforcement of these provisions. 25 USC 2701(d)(3)(C). The state must demonstrate that it has negotiated in good faith, and failed negotiations may be challenged in court and submitted to a mediator for resolution. 25 USC 2710(d)(7)(B).

---

[3] The parties do not dispute the classification of gaming at issue.

## II. THE FEDERAL COMPACT CLAUSE

US Const, art I, § 10, cl 3 provides:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

A compact is a contract. *Texas v New Mexico*, 482 US 124, 128; 107 S Ct 2279; 96 L Ed 2d 105 (1987). For interstate agreements that fall outside the scope of the Compact Clause, congressional consent is not required. *Cuyler v Adams*, 449 US 433, 440; 101 S Ct 703; 66 L Ed 2d 641 (1981). An agreement falls outside the scope of the Compact Clause when it is not directed to the formation of any combination tending to increase the political power in the States, which may encroach upon or interfere with the just supremacy of the United States. *Id.* Thus, if an agreement falls outside the scope of the Compact Clause, it will not be invalidated on the basis of lack of congressional consent. *Id.* Congressional consent to a compact elevates the interstate compact into a law of the United States. *Texas, supra.* Because an interstate compact can be categorized as both a contract and a statute, it is appropriate to look at contractual rules and rules of statutory construction in the event of an ambiguity. *Oklahoma v New Mexico*, 501 US 221, 236; 111 S Ct 2281; 115 L Ed 2d 207 (1991). Accordingly, it is appropriate to look at legislative history, extrinsic evidence of the compact negotiations, and negotiation history of other interstate compacts when construing a compact. *Id.*

The use of compacts predates the United States Constitution. The Articles of Confederation contained the Compact Clause provision that was later incorporated into the United States Constitution without much explanation. *United States Steel Corp v Multistate Tax Comm*, 434 US 452, 459-462; 98 S Ct 799; 54 L Ed 2d 682 (1978). However, historically, congressional consent was not deemed essential to the validity of a compact. For example, in *Wharton v Wise*, 153 US 155, 168-170; 14 S Ct 783; 38 L Ed 2d 669 (1894), the United States Supreme Court acknowledged that congressional consent was required before a state could enter into an agreement with a foreign state or before two or more states entered into "treaties, alliances, or confederations." However, the lack of congressional consent was not deemed essential to the 1785 compact between Virginia and Maryland to govern the navigation and fishing rights in the Potomac River, the Pocomoke River, and the Chesapeake Bay. *United States Steel Corp, supra* at 460, n 10.

The validity of a compact lacking congressional approval was examined in *United States Steel Corp, supra*. As a result of a decision by the Supreme Court,[4] net income from interstate operations of a foreign corporation could be subjected to state taxation provided that the levy was nondiscriminatory and fairly apportioned to local activities that form a sufficient nexus to support the exercise of taxing power. In response to the decision, Congress authorized a study of uniform taxing standards, but there was no resulting legislation. In the interim, the Multistate Tax

---

[4] See *Northwestern States Portland Cement Co v Minnesota*, 358 US 450; 79 S Ct 357; 3 L Ed 2d 421 (1950).

Compact was drafted. The compact created a Multistate Tax Commission comprised of tax administrators from member states. It authorized the study and development of state and local tax systems to create uniformity and compatibility of tax laws. The commission was also authorized to adopt uniform administrative regulations when two or more states had uniform provisions related to specified types of taxes. These regulations were advisory only, and each member state had the power to reject, disregard, amend, or modify any rule or regulation promulgated by the commission. For the regulations to have any force, each state had to adopt the regulations in accordance with their own law. The commission also allowed audits that would occur on the state's behalf, provided this provision was adopted by a state by statute. Each state retained complete control over all aspects of the computation and rate of taxation, and a state could withdraw from the compact by enacting a repealing statute. The plaintiffs were multistate taxpayers "threatened with audits by the Commission." The complaint attacked the constitutionality of the compact, alleging that, never having received the consent of Congress, it was invalid under the Compact Clause.

The United States Supreme Court acknowledged that most multilateral compacts had been submitted for congressional approval, but concluded, "this historical practice, which may simply reflect considerations of caution and convenience on the part of the submitting States, is not controlling." *Id.* at 471. However, the general rule was that " 'application of the Compact Clause is limited to agreements that are "directed to the formation of any combination tending

to increase the political power in the States, which may encroach upon or interfere with the just supremacy of the United States." ' " *Id.* at 471, quoting *New Hampshire v Maine*, 426 US 363, 369; 96 S Ct 2113; 48 L Ed 2d 701 (1976), quoting *Virginia v Tennessee*, 148 US 503, 519; 13 S Ct 728; 37 L Ed 537 (1893). Thus, the fact that the tax compacts lacked congressional consent was not dispositive. Rather, whether the compacts enhanced "state power quoad the National Government" was the key test. The plaintiffs alleged that the "Compact's effect" threatened federal supremacy. The Supreme Court rejected the constitutional challenges to the compact based on encroachment upon federal supremacy, enhancement of state power, and encroachment upon federal commerce power. *United States Steel Corp, supra* at 473-476.

Specifically, the Supreme Court rejected the constitutional challenges because of the appellants' failure to demonstrate aggrandized power and the failure to demonstrate that any enhanced power could be exercised, stating:

> The third aspect of the Compact's operation said to encroach upon federal commerce power involves the Commission's requirement that multistate businesses under audit file data concerning affiliated corporations. Appellants argue that the costs of compiling financial data of related corporations burden the conduct of interstate commerce for the benefit of the taxing States. *Since each State presumably could impose similar filing requirements individually, however, appellants again do not show that the Commission's practices, as auditing agent for member States, aggrandize their power or threaten federal control of commerce.* Moreover, to the extent that the Commission is engaged in joint audits, appellants' filing burdens well may be reduced.

Appellants' final claim of enhanced state power with respect to commerce is that the "enforcement powers" conferred upon the Commission enable that body to exercise authority over interstate business to a greater extent than the sum of the States' authority acting individually. This claim also falls short of meeting the standard of *Virginia v Tennessee*. Article VIII of the Compact authorizes the Commission to require the attendance of persons and the production of documents in connection with its audits. *The Commission, however, has no power to punish failures to comply. It must resort to the courts for compulsory process, as would any auditing agent employed by the individual States*. The only novel feature of the Commission's "enforcement powers" is the provision in Art VIII permitting the Commission to resort to the courts of any State adopting that Article. Adoption of that Article, then amounts to nothing more than reciprocal legislation for providing mutual assistance to the auditors of the member States. [*Id.* at 475-476 (emphasis added).]

The significance of this decision to the case pending before this Court is two-fold. The consent or approval of compacts is the result of historic practice based on caution or convenience, and the procedure for approval, whether by resolution or legislation, has not been mandated by law.[5] The key test to determine the validity of a compact, in the absence of congressional approval, was an examination of the power structure that was established by the contracting states in relationship to the federal government. Additionally, the

---

[5] Despite the creation of rules governing establishment of a compact, there do not appear to be any uniform rules of procedure for congressional consent. For example, Congress approved a compact between the state of Ohio and Commonwealth of Pennsylvania addressing Pymatuning Lake as an act of Congress, 75 PL 398; 50 Stat 865 (1937), but a compact of free association was passed by joint resolution, 99 PL 658; 100 Stat 3672 (1986). There does not appear to be a rule of procedure to determine whether an act or a joint resolution may be utilized as the method of congressional consent.

allegation of enhanced power through compacts was insufficient to void the compact where there was an inability to exercise that power.

### III. MICHIGAN LAW ADDRESSING COMPACTS

While federal law has been established to govern the construction and interpretation of a compact and the necessity of congressional consent or approval, Michigan has not delineated standards for passage of compacts or contracts. However, two Michigan appellate court decisions contain dicta that address compacts. In 1990, pursuant to the IGRA, several Indian tribes filed suit against Governor Engler to compel him to enter into a gaming compact. *Tiger Stadium Fan Club, Inc v Governor*, 217 Mich App 439, 443; 553 NW2d 7 (1996). Before trial, the parties entered into a consent judgment. This consent judgment provided that the tribes would make semiannual payments of eight percent of gaming revenues to the Michigan Strategic Fund (MSF), a public corporation established by the Michigan Strategic Fund Act, MCL 125.2001 *et seq.*; for a specified period. Additionally, the tribes would make payments of two percent of certain gaming revenues to local units of government in the immediate vicinity of each tribal casino. The consent judgment became effective upon execution and approval of the compacts by resolution of the Legislature. The Legislature approved the compacts by resolution in September 1993, although the resolution did not specifically mention the payments to the MSF. However, the Legislature was aware of the terms. *Tiger Stadium Fan Club, supra* at 443-444.

After the tribal casinos began making deposits to the MSF, the City of Detroit Downtown Development

Authority (DDA) requested a grant. The MSF adopted a resolution and agreed to the grant request in an amount not to exceed $55 million. This grant agreement provided that the funds would be used to assist with costs associated with infrastructure, land development, and site development necessary for the construction of a new stadium for the Detroit Tigers. A complaint was filed, alleging that the gaming revenues were state funds within the meaning of the Appropriations Clause of the state constitution and any disbursement from the fund by the MSF without an appropriation by the Legislature was a violation of the Separation of Powers Clause of the state constitution. It was also asserted that the MSF did not have the statutory authority to make a grant to the DDA. *Id.* at 448-449.

This Court concluded that the revenues involved were not public funds subject to appropriation because they were gratuitous payments negotiated by the Governor and designated for a specific purpose, and payment to and disbursement from the MSF without an act of the Legislature did not violate the Appropriations Clause. *Id.* at 452-454. The Court of Appeals also concluded that the Governor did not violate the Separation of Powers Clause by negotiating and effectuating the settlement, stating:

> We conclude, however, that because the revenues are not subject to the Appropriations Clause and are gratuitous payments for a designated purpose, no appropriation was necessary and the Governor did not usurp the Legislature's power in entering into an agreement providing for the payment of the revenues directly to the MSF and that the Separation of Powers Clause does not require legislative action before the revenues may be spent by the MSF. It has long been Michigan law that courts should not interfere with the

actions of the Governor when he acts pursuant to constitu-
tional or statutory authority. See *Sutherland v Governor*, 29
Mich 320, 328 (1874). We also observe that the Legislature
was aware that the consent judgment provided that the
gaming revenues were to be paid directly to the MSF. Thus,
the Governor constitutionally caused the equivalent of a
grant to be made, with the approval of the Legislature, to a
state corporation authorized by the Legislature to receive
and accept grants, gifts, and other aids. [*Tiger Stadium Fan
Club, supra* at 454-456.]

In a footnote, the Court of Appeals noted that the
House of Representatives concurred in the tribal-state
gaming compacts. However, the resolution when con-
sidered by the Senate drew criticism. It was ques-
tioned whether the Governor had the authority to
negotiate the compact, whether the general proce-
dures for enacting a law should apply, and whether
the generated funds should be utilized for the con-
struction of a team stadium. However, ultimately, the
Senate approved the resolution. This Court, in dicta,
rejected any concern about usurped powers:

It is thus clear, first, that the Senate was aware of the
terms of the compacts and consent judgment, including the
provision for the payment of eight percent of certain gam-
ing revenues directly to the MSF, and, second, that the Sen-
ate rejected challenges to the Governor's constitutional
authority to negotiate the compacts and adopted the con-
current resolution with the intention of ratifying and
approving the compacts and settlement agreement as nego-
tiated by the Governor. We recognize that it is a separate
question whether the concurrent resolution would consti-
tute sufficient legislative action if the revenues were deter-
mined to be subject to appropriation, one we do not
address because our decision that the revenues are not sub-
ject to appropriation makes it unnecessary to do so. Putting
aside Appropriations Clause considerations, and having in
mind that the Legislature ratified and approved the Gover-

nor's actions and the resulting compacts and consent judg-
ment, we reject the argument that the Governor usurped
the powers of the Legislature. [*Id.* at 455-456, n 5.]

Thus, previously, in the context of a compact, the
Legislature questioned how a compact should be
approved, but took no action to implement rules
regarding passage of compacts. Significantly, this
Court held, albeit in dicta, that there was no usurping
of power by the Governor because the Legislature rat-
ified and approved the consent judgment through the
use of a joint resolution. However, this Court may
find dicta persuasive and choose to follow it. *Dykstra
v Dep't of Transportation*, 208 Mich App 390, 392; 528
NW2d 754 (1995).[6]

In *McCartney v Attorney General*, 231 Mich
App 722, 724-725; 587 NW2d 824 (1998), the plaintiff
filed suit when the defendant failed to provide six
documents relating to the Governor's negotiations
with three Indian tribes regarding casino gambling as
requested under the Freedom of Information Act
(FOIA), MCL 15.231 *et seq.* The documents were cate-
gorized as those delivered by the Governor's office to
the defendant, seeking legal advice, and internal
memoranda of the defendant with regard to the legal
advice. The trial court held that the documents were
exempt from production under the attorney-client

---

[6] We note that plaintiffs rely on an opinion of the Attorney General that
concluded that the compacts should have been submitted as legislation.
OAG, 1997-1998, No 6960, p 83 (October 21, 1997). The opinion of the
Attorney General is not binding on courts as precedent, and it is question-
able whether a governmental agency is even bound by an opinion of the
Attorney General. *Danse Corp v Madison Heights*, 466 Mich 175, 182, n 6;
644 NW2d 721 (2002). Following an in-depth analysis of the historical con-
text of tribal gaming, the historical approval of compacts, the origins of
tribal gaming through IGRA, and Michigan case law, we decline the invita-
tion to adopt the opinion of the Attorney General.

privilege exemption of the FOIA, MCL 15.243(1)(h), and the deliberative process exemption, MCL 15.243(1)(n). As a preliminary matter, the plaintiff alleged that the defendant and the Governor did not enjoy an attorney-client relationship with regard to the documents and that the Governor's actions were "ultra vires" or outside the scope of his authority. This Court held that there was a reasonable basis for the Governor's authority to negotiate tribal-state gaming compacts:

The Governor is constitutionally authorized to present and recommend legislation. Const 1963, art 5, § 17. There is no prohibition in Michigan law that would bar the Governor's actions in negotiating a gaming compact and then presenting it to the Legislature. Several other jurisdictions have reached similar conclusions in addressing the precise issue whether a state governor has authority to negotiate gambling compacts with Indian tribes pursuant to the federal Indian Gaming Regulatory Act (IGRA), 25 USC 2701 et seq.

In *State ex rel Stephan v Finney*, 251 Kan 559, 582-583; 836 P2d 1169 (1992), the court held that the governor had power to negotiate a gaming compact with an Indian tribe, but could not bind the state to the resulting terms of any compact. Absent "an appropriate delegation of power by the Kansas Legislature or legislative approval of the compact, the Governor had no power to bind the State to the terms" of the compact. *State ex rel Stephan v Finney*, 254 Kan 632, 635; 867 P2d 1034 (1994). In *State ex rel Clark v Johnson*, 120 NM 562; 904 P2d 11 (1995), the court recognized that the governor could not enter into a gaming compact solely on his own authority. It held that the governor lacked constitutional authority to bind the state by unilaterally entering into compacts. *Id.* at 576. However, the court also recognized that the legislature could authorize the governor to enter into a gaming compact "*or ratify his actions with respect to a compact he has negotiated . . . .*" *Id.* at 574 (emphasis added). Thus, although the governor could not

bind the state, he could negotiate a compact subject to legislative ratification. Finally in *Narragansett Indian Tribe of Rhode Island v State*, 667 A2d 280 (RI, 1995), the court held that the governor lacked constitutional and legislative authority to bind the state to a compact negotiated by him. However, the court noted:

"We also take care to note that our opinion in no way suggests that the Governor, in his capacity as Chief Executive officer of this state, lacks the authority to advocate, to initiate, and to negotiate, short of executing, a tribal-state compact. All that we determine herein is that the Governor, absent specific authorization from the General Assembly, had no express or implied constitutional right or statutory authority to finally execute and bind the state to such a compact by his execution thereof. [*Id.* at 282.]" [*McCartney, supra* at 726-728.]

This Court then recognized the *Tiger Stadium* decision:

Recently, this Court indicated that the Governor had the ability to negotiate and enter into compacts with an Indian tribe under the IGRA. In *Tiger Stadium Fan Club, Inc v Governor*, 217 Mich App 439; 553 NW2d 7 (1996), the Governor had been sued by Indian tribes to compel him to conclude a gaming compact. Subsequently, the Governor negotiated and entered into a consent judgment, which included a provision that certain gaming revenues would be paid into the Michigan Strategic Fund as long as the compact remained in effect. *Id.* at 443. "The consent judgment was to become effective *upon execution of compacts between the tribes and the Governor and approval of the compacts by resolution of the Legislature.*" *Id.* (emphasis added). Although the issue in *Tiger Stadium Fan Club* was different than that presented to this Court in this case (the plaintiffs in *Tiger Stadium Fan Club* were arguing that the Governor did not have authority to agree that revenues would be paid directly to the strategic fund), this Court ruled that the Governor "did not violate the Separation of Powers Clause in negotiating and effectuating the settlement." *Id.* at 454. The

Governor negotiated and executed the compact and then presented it to the Legislature as part of the consent judgment. Thus, this Court acknowledged that the Governor has the ability to enter into compacts with Indian tribes, subject to the approval of the Legislature.

We emphasize that the Governor has executive power, Const 1963, art 5, § 1, and the power to suggest legislation, Const 1963, art 5, § 17. We also emphasize that there is no constitutional impediment to the Governor's negotiating with an Indian tribe where the product of his negotiations has no effect without legislative approval. We find that there are bases upon which the Governor had authority to negotiate with the Indian tribes on proposed compacts, which were subsequently presented to the Legislature for approval. For that reason, we cannot conclude that his actions were clearly ultra vires. Rather, we conclude that the Governor did not usurp legislative power because he did not attempt to bind the Legislature or the state to any terms in the compact. He did not enact legislation or force legislation on the Legislature. In its well-reasoned opinion, the trial court also recognized that the Governor did not exceed the scope of his authority when he conducted negotiations and discussions with the Indian tribes and later presented gaming compacts to the Legislature for its approval or rejection. We agree with the trial court's analysis. [*Tiger Stadium Fan Club, supra* at 728-729.]

As previously stated, this Court may adopt dicta that we find persuasive. *Dykstra, supra.* The Governor clearly had the authority to negotiate the compacts with the Indian tribes. Following these negotiations, the compacts were submitted to the Legislature for approval. This approval took the form of a joint resolution, rather than legislation. The difference between the forms of approval is that legislation receives an enhanced standard of adoption. The resolution process required only a majority of members who were present or chose to participate, not a

majority of elected members. The compact agreements were not the result of a decision by the citizenry at large or a policy choice by members of the Legislature, but rather, were the result of congressional policy in an area where state law is preempted. Accordingly, we adopt the dicta set forth in *McCartney, supra,* and *Tiger Stadium Fan Club, supra,* and reject plaintiffs' constitutional challenges as set forth in this opinion.

### IV. APPELLATE REVIEW

Our review of constitutional issues is de novo. *Armstrong v Ypsilanti Charter Twp,* 248 Mich App 573, 582; 640 NW2d 321 (2001). The party asserting the constitutional challenge has the burden of proof. *Taylor v Gate Pharmaceuticals,* 248 Mich App 472, 477; 639 NW2d 45 (2001). Before addressing the constitutionality of a provision, this Court must examine alternative, nonconstitutional grounds that might obviate the necessity of deciding the constitutional question. *VandenBerg v VandenBerg,* 231 Mich App 497, 499; 586 NW2d 570 (1998). Furthermore, constitutional questions will not be addressed when the issue is not ripe for review. *Dep't of Social Services v Emmanuel Baptist Preschool,* 434 Mich 380, 389; 455 NW2d 1 (1990).

### V. THE CONSTITUTIONAL CHALLENGES

Plaintiffs allege that the submission of the compacts for approval through the joint resolution process instead of through the legislative process for passage of a bill violates Const 1963, art 4, § 22, art 3, § 2, and art 4, § 29.

Const 1963, art 4, § 22 provides: "All legislation shall be by bill and may originate in either house."

Const 1963, art 3, § 2 provides: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."

Const 1963, art 4, § 29 provides:

> The legislature shall pass no local or special act in any case where a general act can be made applicable, and whether a general act can be made applicable shall be a judicial question. No local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected. Any act repealing local or special acts shall require only a majority of the members elected to and serving in each house and shall not require submission to the electors of such district.

However, we also note that plaintiffs repeatedly question the astuteness of the process by asserting that lame duck members, to avoid contravening the public policy of this state against casino gambling, resorted to joint resolution for approval. This assertion ignores the process through which these casinos originated. Michigan voters did not approve and could not approve of the casinos at issue. Furthermore, state legislators did not have the option of approving or disapproving casino gambling operated by Indian tribes. States that permit gambling activities, subject to regulation, may not prohibit casino gambling. *Cabazon, supra.* Indeed, this state, before the voter initiated referendum approving casinos in the city of Detroit, permitted various forms of gambling. This

state authorized horse racing, MCL 431.301 *et seq.*, and established and operates a state lottery, MCL 432.9, that is promoted through advertising. See MCL 432.41(4). Finally, a voter initiated law authorized casino gambling in the city of Detroit.[7] Thus, Michigan regulates rather than prohibits gambling. Pursuant to *Cabazon, supra,* the state cannot prohibit Indian tribal gaming. In light of statutory regulation authorizing gambling activities in this state, federal law dictates that the state negotiate compacts with Indian tribes to allow casino gambling on Indian reservations. 25 USC 2701 *et seq.*

As an initial matter, we note that the IGRA sets forth the authorization for class III gaming activities between Indian tribes and individual states in 25 USC 2710(d):

> (d) Class III gaming activities; authorization; revocation; Tribal-State compact
>
> (1) Class III gaming activities shall be lawful on Indian lands only if such activities are—
>
> (A) authorized *by an ordinance or resolution* that—
>
> (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,
>
> (ii) meets the requirements of subsection (b) of this section, and
>
> (iii) is approved by the Chairman,
>
> (B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and

---

[7] MCL 432.202(l)(i) permits gambling based on a population of at least 800,000 at the time of issuance of a license. We note also that the Michigan Gaming Control and Revenue Act (MGCRA), MCL 432.201 *et seq.*, contains an exception to its application with regard to casino gambling conducted under the IGRA. MCL 432.203(2). Additionally, in the event that states are given authority by the federal government to regulate gambling on Indian tribal land, new legislation would be passed to regulate those casinos. MCL 432.203(5).

(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect. [Emphasis added.]

Review of the plain language of the IGRA, *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999), reveals that authorization may occur through ordinance or by resolution. In light of the acknowledged preemption in this area, see MCL 432.203(5), the resolution process is a sufficient method for approval of compacts. The approval by resolution contained in the IGRA is consistent with federal law addressing compacts. Congressional approval was generally one of historic occurrence rather than necessity. The true test of congressional approval occurs when powers of an entity are usurped. *United States Steel Corp, supra.* State legislative power cannot be usurped in this context because of the congressional decision to permit casino gambling on tribal land and the terms of the IGRA. While states may have the ability to negotiate and include regulatory terms in the compacts, there is no mechanism for enforcement. Rather, any dispute is submitted to arbitration or a mediator. Consequently, the challenge to the method of approval by resolution is without merit.

However, we also independently conclude that Const 1963, art 4, § 22 was not violated. Irrespective of the terms of the compacts that impose obligations on the Indian tribes themselves and the administrative functions assumed by the state, there is no enforcement provision within compacts to ensure that the compact terms are satisfied. Similarly, irrespective of whether the terms of the compact encroach upon legislative functions, the inability to

enforce those terms precludes a challenge to the constitutionality of the compact. *United States Steel Corp, supra.* There is no indication that the limited role of the states and the plenary authority held by Congress has been altered by the terms utilized in the compacts. Plaintiffs cannot theorize that the language of the compacts rises to the level of legislation, but rather has the burden of proof to establish the alleged constitutional violation. *Taylor, supra.* Plaintiffs have failed to meet this burden.[8]

Additionally, to construe a compact, we examine its history, extrinsic evidence of the negotiations concerning the compact, and the negotiation history of other compacts. *Oklahoma, supra.* Defendants allege and plaintiffs do not dispute that contracts executed by the state of Michigan are routinely approved by the resolution process. *Taylor, supra.* Furthermore, in 1993, compacts were approved by the resolution process. *Tiger Stadium Fan Club, supra.* The Legislature has a prior course of conduct, albeit unwritten, for approval of contracts. "Neither an administrative

---

[8] We note that, despite the extensive pleadings filed in this action, plaintiffs failed to address various facts raised by defendant. For example, defendant noted that the compacts executed in 1993 were approved by the resolution process and that a declaration that the compacts of 1998 are invalid because they were approved by resolution would necessarily negate the prior compacts. Additionally, defendant asserts, and plaintiffs do not dispute, that approval by resolution is the form of approval employed for state contracts. If, by course of conduct, contractual approval occurs through the resolution process, it is inappropriate to seek judicial interference with this legislative process. We note that the standing rules of each legislative body contain references to contracts, resolutions, and appropriations under certain circumstances. A written policy of contract approval in these rules or passage of legislation addressing approval of contracts would alleviate a challenge to the manner of contract approval. Additionally, we note that the parties failed to address what remedy would be available if we had determined that the resolution process was unconstitutional in light of Const 1963, art 1, § 10.

agency nor the judicial branch should trump the legislative process." *Michigan Gaming Institution, Inc v State Bd of Ed*, 211 Mich App 514, 522; 536 NW2d 289 (1995), rev'd on other grounds 451 Mich 899 (1996).[9]

Plaintiffs next allege that the compacts violate the Separation of Powers Clause, Const 1963, art 4, § 29, because the compacts give the Governor the authority to amend the compacts without a provision for legislative approval of the amendments. We disagree. Constitutional questions will not be addressed when the issue is not ripe for review. *Emmanuel Baptist, supra.* There is no indication that amendment was requested or made in this manner. Accordingly, this issue is not ripe for appellate review.

Lastly, plaintiffs allege that the compacts violated the provision requiring passage of legislation affecting local communities. Const 1963, art 4, § 29. We disagree. This state has no authority to regulate conduct on Indian tribal lands. Thus, while cities surrounding the designated casino areas may be affected, the IGRA has provided that Indian tribes may operate casinos on tribal lands. The citizens of the state of Michigan cannot vote on the propriety of placing tribal casinos on tribal lands. Thus, this argument is without merit.

---

[9] In *Michigan Gaming Institution*, the petitioner applied to the respondents for a license to operate a school to teach prospective gambling employees. Then appellate Judge, now Justice, CORRIGAN concluded in her dissent that the application should be denied because the school would be teaching behavior that violates provisions of the Penal Code. However, the dissenting opinion, adopted by the Supreme Court, expressly noted that public opinion regarding casino gambling was "in flux" and that Michigan did not choose to allow casino gambling on Indian reservations, but was required to negotiate with the tribes by virtue of the IGRA. Plaintiffs' contention that this opinion supports their position is without merit. Rather, the forecast of change in the context of casino gambling was realized as shown by the MGCRA.

Accordingly, we reverse the trial court's conclusion that the approval of the compacts by way of resolution violates Const 1963, art 4, § 22 and Const 1963, art 3, § 2, and affirm the trial court's conclusion that the approval did not violate Const 1963, art 4, § 29, albeit on other grounds.[10]

Affirmed in part and reversed in part. We do not retain jurisdiction.

---

[10] Although procedural challenges were raised regarding plaintiffs' standing and regarding real party in interest based on the failure to add the Indian tribes to the litigation, we have addressed the merits of the appeal because the issue was one of recurring public significance that was not definitively resolved by *McCartney, supra,* and *Tiger Stadium Fan Club, supra.* See *Camden v Kaufman,* 240 Mich App 389, 393; 613 NW2d 335 (2000).