**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:        Justices:
Clifford W. Taylor    Michael F. Cavanagh
                      Elizabeth A. Weaver
                      Marilyn Kelly
                      Maura D. Corrigan
                      Robert P. Young, Jr.
                      Stephen J. Markman

FILED MAY 30, 2007

TAXPAYERS OF MICHIGAN AGAINST
CASINOS and LAURA BAIRD, State
Representative in her official capacity,

      Plaintiffs-Appellants,

v                      No. 129816

THE STATE OF MICHIGAN,

      Defendant-Appellee,

and

GAMING ENTERTAINMENT, LLC and
LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,

      Intervening Defendants-
      Appellees,

and

NORTH AMERICAN SPORTS
MANAGEMENT COMPANY,

      Intervening Defendant.

TAXPAYERS OF MICHIGAN AGAINST
CASINOS and LAURA BAIRD, State
Representative in her official capacity,

   Plaintiffs-Appellees,

v             No. 129818

THE STATE OF MICHIGAN,

   Defendant-Appellant,

and

GAMING ENTERTAINMENT, LLC and
LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,

   Intervening Defendants-
   Appellees,

and

NORTH AMERICAN SPORTS
MANAGEMENT COMPANY,

   Intervening Defendant.

_____

TAXPAYERS OF MICHIGAN AGAINST
CASINOS and LAURA BAIRD, State
Representative in her official capacity,

   Plaintiffs-Appellees,

v

2

THE STATE OF MICHIGAN,

Defendant-Appellee,

and                                                                      No. 129822

GAMING ENTERTAINMENT, LLC,

Intervening-Defendant-
Appellee,

and

LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,

Intervening Defendant-
Appellant,

and

NORTH AMERICAN SPORTS
MANAGEMENT COMPANY,

Intervening Defendant.

_____

BEFORE THE ENTIRE BENCH

CAVANAGH, J.

We granted leave to appeal to determine whether the amendatory provision in the compacts at issue and the exercise of that provision by the Governor violate the Separation of Powers Clause of the Michigan Constitution. 474 Mich 1097 (2006).[1] We hold that the amendatory provision and the exercise of that provision

_____

[1] We note that while Laura Baird is a named plaintiff in this case, she has been inactive during the appellate process. In fact, Baird filed a motion with the

(continued…)

do not violate the Separation of Powers Clause because the amendatory provision was properly approved by legislative resolution and the Governor's exercise of the amendatory provision was within the limits of the constitution. Further, we hold that the issue whether the compacts violate the Appropriations Clause of the Michigan Constitution is not properly before this Court because the issue is beyond the parameters of this Court's prior order remanding this matter to the Court of Appeals. Thus, we reverse in part the judgment of the Court of Appeals and hold that the amendatory provision and the current exercise of that provision do not violate the Separation of Powers Clause. We further affirm in part the judgment of the Court of Appeals that struck the portion of plaintiff's brief that sought to address the Appropriations Clause issue. Accordingly, we remand this case to the circuit court for the entry of a judgment of summary disposition in favor of defendants.

## I. STATEMENT OF FACTS AND PROCEEDINGS

In January 1997, Governor John Engler and four Indian tribes signed tribal gaming compacts. The four tribes were the Little Traverse Bay Bands of Odawa Indians, the Pokagon Band of Potawatomi Indians, the Little River Band of Ottawa Indians, and the Nottawaseppi Huron Potawatomi. In *Taxpayers of*

---

(continued…)
Court of Appeals asking that she be dismissed as a party. While this motion was denied, her inactivity has rendered the issue of standing as it relates to legislators
(continued…)

4

*Michigan Against Casinos v Michigan*, 471 Mich 306; 685 NW2d 221 (2004) (*TOMAC I*), this Court considered three aspects of the alleged unconstitutionality of these tribal gaming compacts between the state and the tribes. This Court affirmed the Court of Appeals judgment, 254 Mich App 23; 657 NW2d 503 (2002), that held that the compacts were properly approved by the Legislature through a resolution, rather than a bill; that this did not violate art 4, § 22 of the Michigan Constitution; and that the resolution was not a "local act" in violation of art 4, § 29 of the Michigan Constitution. However, this Court also held that the question whether the amendatory provision in the compacts was constitutional under the Separation of Powers Clause, Const 1963, art 3, § 2, was not ripe for review because the Court of Appeals had not considered the issue. Governor Jennifer Granholm's exercise of the amendatory authority had not occurred until after the Court of Appeals decision. Thus, this Court remanded the matter to the Court of Appeals to determine whether the amendatory provision violates the separation of powers doctrine.

On remand, the Court of Appeals held that the compacts' amendatory provision, which allows the Governor to amend the compacts without legislative approval, violates the Separation of Powers Clause. *Taxpayers of Michigan Against Casinos v Michigan (On Remand)*, 268 Mich App 226, 228; 708 NW2d

_____

(continued…)

moot. Accordingly, the term "plaintiff" when used in this opinion only refers to

(continued…)

5

115 (2005). Judge Borrello dissented and stated that the Separation of Powers Clause was not violated because the Legislature's approval of the compacts included approval of the amendatory provision.

## II. STANDARD OF REVIEW

This Court reviews de novo a decision regarding a motion for summary disposition. *Herald Co v Bay City*, 463 Mich 111, 117; 614 NW2d 873 (2000). This Court also reviews constitutional issues de novo. *Harvey v Michigan*, 469 Mich 1, 6; 664 NW2d 767 (2003). Decisions involving the meaning and scope of pleadings are reviewed for an abuse of discretion. *Dacon v Transue*, 441 Mich 315, 328; 490 NW2d 369 (1992).

## III. ANALYSIS

Under the Indian Gaming Regulatory Act (IGRA), 25 USC 2701 *et seq.*, an Indian tribe may conduct gaming within the borders of a state if the activity conforms to a compact between the state and the tribe. The compacts at issue were signed by Governor Engler, and the Legislature approved the compacts by resolution. In 2003, Governor Granholm consented to an amendment of the compact with the Little Traverse Bay Bands of Odawa Indians.

### A. SEPARATION OF POWERS CLAUSE

---

(continued…)
plaintiff Taxpayers of Michigan Against Casinos.

Michigan's Separation of Powers Clause states: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2. "This Court has established that the separation of powers doctrine does not require so strict a separation as to provide no overlap of responsibilities and powers." *Judicial Attorneys Ass'n v Michigan*, 459 Mich 291, 296; 586 NW2d 894 (1998). An overlap or sharing of power may be permissible if "the grant of authority to one branch is limited and specific and does not create encroachment or aggrandizement of one branch at the expense of the other . . . ." *Id.* at 297. The Separation of Powers Clause "has not been interpreted to mean that the branches must be kept wholly separate." *Soap & Detergent Ass'n v Natural Resources Comm*, 415 Mich 728, 752; 330 NW2d 346 (1982).

The amendatory provision at issue provides:

Section 16. Amendment

This Compact may be amended by mutual agreement between the Tribe and the State as follows:

(A) The Tribe or the State may propose amendments to the Compact by providing the other party with written notice of the proposed amendment as follows:

(i) The Tribe shall propose amendments pursuant to the notice provisions of this Compact by submitting the proposed amendments *to the Governor who shall act for the State*.

7

(ii) *The State, acting through the Governor,* shall propose amendments by submitting the proposed amendments to the Tribe pursuant to the notice provisions of this Compact.

(iii) Neither the tribe nor the State may amend the definition of "eligible Indian lands" to include counties other than those set forth in Section 2(B)(1) of this Compact. . . .

* * *

(B) The party receiving the proposed amendment shall advise the requesting party within thirty (30) days as follows:

(i) That the receiving party agrees to the proposed amendment; or

(ii) That the receiving party rejects the proposed amendment as submitted and agrees to meet concerning the subject of the proposed amendment.

(C) Any amendment agreed to between the parties shall be submitted to the Secretary of the Interior for approval pursuant to the provisions of the IGRA.

(D) Upon the effective date of the amendment, a certified copy shall be filed by the Governor with the Michigan Secretary of State and a copy shall be transmitted to each house of the Michigan Legislature and the Michigan Attorney General. [Emphasis added.]

Governor Granholm and the Little Traverse Bay Band of Odawa Indians agreed to amend the compact in a number of ways. Among other items, the amendment permitted a second casino to be constructed on eligible Indian lands of the Little Traverse Bay Bands of Odawa Indians, contingent on the approval of the local unit of government; changed the age of legal gambling from 18 to 21 at this casino; mandated that tribal payments must now be sent to the state, as directed by the Governor or a designee of the Governor, as opposed to sending the payments to the Michigan Strategic Fund or its successor; and mandated that the compact

8

was binding for 25 years from the effective date of the amendments, instead of being binding for 20 years from the effective date of the compact.

The amendatory provision allows the Governor to act for the state in reviewing and approving amendments submitted by the tribes and in proposing amendments to the tribes. This amendatory provision expresses the bilateral agreement between the parties that the Governor will represent the state in matters involving amendments. The Legislature reviewed the language of this amendatory provision and approved the amendment procedure, which gives the Governor broad discretion—within the limits of the constitution—to amend the compacts.

The compacts were properly approved by legislative resolution.[2] As stated in *TOMAC I*, "our Constitution does not require that our Legislature express its approval of these compacts through bill rather than resolution." *TOMAC I*, *supra* at 313. The compacts—when approved by the Legislature—included the amendatory provision. As this Court held in *TOMAC I*, *supra* at 313, a resolution was sufficient for legislative approval of the compacts. Similarly, the resolution

---

[2] While Justice Markman again revisits his arguments that the compacts were legislation under *Blank v Dep't of Corrections*, 462 Mich 103; 611 NW2d 530 (2000), this Court already explained its position and addressed the flaws in Justice Markman's rationale in *TOMAC I*, *supra* at 318-333; thus, there is no reason to reiterate this reasoning. Further, Justice Markman's discussion that MCL 432.203(5) suggests that casino gaming must be authorized by legislation in the absence of a compact is irrelevant here because there *is* a compact in this case in accord with IGRA and the compact properly allows for amendments.

9

also amounted to sufficient approval for the amendatory provision within the compacts.

The Legislature's approval of the amendatory provision gave consent to amendments that conform to the approved procedure. The Legislature chose to approve an amendment procedure that gives the Governor broad power to amend the compacts, and the Legislature was well within its authority to make such a decision. See *id*. at 329. This Court has long recognized the ability of the Legislature to confer authority on the Governor. See, e.g., *People ex rel Sutherland v Governor*, 29 Mich 320, 329 (1874). This Court has further recognized that discretionary decisions made by the Governor are not within this Court's purview to modify. See, e.g., *People ex Rel Ayres v Bd of State Auditors*, 42 Mich 422, 426; 4 NW 274 (1880).[3]

As this Court stated in *TOMAC I*, *supra* at 328, "We have held that our Legislature has the general power to contract unless there is a constitutional limitation." There is no limitation in Michigan's Constitution on the Legislature's power to bind the state to a compact with a tribe. "State legislatures have no regulatory role under IGRA aside from that negotiated between the tribes and the states." *Id*. at 320. The Legislature's approval of the compacts only follows the

---

[3] Contrary to Justice Markman's claims, we note that the Governor's authority to negotiate amendments is not without limits. Some limits are in the compacts themselves, and the Governor cannot negotiate amendments that extend

(continued…)

assent of the parties to the compacts. This does not establish, "in the realm of Indian casinos, 'government by contract'" that avoids the restrictions and provisions of the constitution, as argued by Justice Markman. *Post* at 23. The amendments—just as the compacts themselves—"only set forth the parameters within which the tribes, as sovereign nations, have agreed to operate their gaming facilities." *TOMAC I*, *supra* at 324. Our constitution does not prohibit the Legislature from approving compacts by concurrent resolution. *Id*. at 327-328. Thus, it is entirely permissible for the Legislature to provide, by resolution, that the Governor may negotiate subsequent amendments to the compacts. Because the agreed-to amendments are permissible, plaintiff has failed to establish that the amendatory provision and the exercise of that provision are unconstitutional. The amendatory provision survives both a facial and an as-applied challenge under the Separation of Powers Clause because all the amendments negotiated by the Governor are permissible. See *Judicial Attorneys Ass'n*, *supra* at 303; *Woll v Attorney General*, 409 Mich 500, 535 n 50; 297 NW2d 578 (1980). Specifically, the amendments "do not impose new obligations on the citizens of the state subject to the Legislature's power; they simply reflect the contractual terms agreed

---

(continued…)
beyond these limits. And, of course, the Governor cannot agree to an amendment that would violate the constitution or invade the Legislature's lawmaking function.

11

to by two sovereign entities." *TOMAC I*, *supra* at 327;[4] see also *TOMAC I*, *supra* at 344 (Kelly, J., concurring) (The compacts "place no restrictions or duties on the people of the state of Michigan. They create no duty to enforce state laws on tribal lands.").

Finally, today's decision is not in conflict with this Court's past decision in *Roxborough v Unemployment Compensation Comm*, 309 Mich 505; 15 NW2d 724 (1944). In *Roxborough*, *supra* at 510, this Court stated that the Governor could "exercise only such authority as was delegated to him by legislative enactment." This Court held that the Governor could not increase compensation for an employee of the appeal board of the Unemployment Compensation Commission because the Legislature had passed legislation to limit the compensation of this employee to the maximum amount permitted by the Social Security Board. The Governor could not ignore this limitation. *Roxborough* is inapplicable because that case dealt with a unilateral act of the Legislature. The

---

[4] Justice Markman is simply incorrect when he states that the fact that the amendments reflect the contractual terms agreed to by two sovereign nations is "irrelevant to the necessary constitutional analysis." *Post* at 36. As thoroughly explained in *TOMAC I*, *supra* at 324, "the hallmark of legislation is unilateral imposition of legislative will. Such a unilateral imposition of legislative will is completely absent in the Legislature's approval of tribal-state gaming compacts under IGRA." Thus, the Legislature's role in approving the compacts and amendatory provision "requires mutual assent by the parties—a characteristic that is not only the hallmark of a contractual agreement but is also absolutely foreign to the concept of legislating." *Id*. Justice Markman's dissent is largely premised on the notion that the compacts and the amendments constitute legislation; thus, it is perplexing why a statement showing the contrary is irrelevant to the analysis.

compacts, however, are bilateral agreements. Further, the Legislature's approval by resolution of the compacts—which included the amendatory provision—provides the Governor with authority to negotiate and agree to amendments on behalf of the state. Thus, the amendatory provision—on its face and as it was exercised by the Governor—does not violate the Separation of Powers Clause of the Michigan Constitution.

## B. APPROPRIATIONS CLAUSE

Michigan's Appropriations Clause states, "No money shall be paid out of the state treasury except in pursuance of appropriations made by law." Const 1963, art 9, § 17. On remand in the Court of Appeals, plaintiff argued that the compacts violate Michigan's Appropriations Clause because this Court determined that the compacts are contracts. Plaintiff argued that consideration must have been exchanged by the parties to each compact. Therefore, the tribal payments under the compacts are state funds that the Legislature must appropriate by legislation. Plaintiff raised this issue for the first time in the Court of Appeals when this case was remanded, and plaintiff argued that the issue was within the scope of this Court's remand order and could not have been raised earlier because it was based on this Court's ruling in *TOMAC I*. Intervening defendant Gaming Entertainment, LLC, moved to strike the portion of plaintiff's brief dealing with the Appropriations Clause because the issue went beyond this Court's remand

13

order. The Court of Appeals granted the motion to strike and, thus, did not address this issue.

We agree with the Court of Appeals that the appropriations issue was not properly before it. This Court remanded this matter to the Court of Appeals to address a specific issue—"whether the provision in the compacts purporting to empower the Governor to amend the compacts without legislative approval violates the separation of powers doctrine found in Const 1963, art 3, § 2." *TOMAC I*, *supra* at 333. The appropriations issue is outside the scope of this Court's remand order; thus, the Court of Appeals correctly held that the issue was not properly before it. See, e.g., *Napier v Jacobs*, 429 Mich 222, 228; 414 NW2d 862 (1987); *People v Jones*, 394 Mich 434, 435-436; 231 NW2d 649 (1975). Plaintiff cannot raise any issue it chooses merely because this Court remanded this case to the Court of Appeals to address another issue. Simply, if this Court had not remanded the matter to the Court of Appeals to address the separation of powers issue, plaintiff would not be able to raise a new issue directly in the Court of Appeals. Similarly, plaintiff cannot do so now.

## IV. CONCLUSION

We hold that the amendatory provision and the Governor's exercise of that provision do not violate the Separation of Powers Clause because the amendatory provision was properly approved by legislative resolution and the Governor's use of the amendatory provision was exercised within the limits of the constitution.

14

Thus, we reverse in part the judgment of the Court of Appeals and hold that the amendatory provision and the current exercise of that provision do not violate the Separation of Powers Clause.  We further hold that the issue whether the tribal payments under the compacts violate the Appropriations Clause of the Michigan Constitution is not properly before this Court because it is beyond the parameters of this Court's prior remand order.  Thus, we affirm in part the judgment of the Court of Appeals that  struck the portion  of plaintiff's brief that sought to  address

the Appropriations Clause issue. Accordingly, we remand this case to the circuit court for entry of a judgment of summary disposition in favor of defendants.

> Michael F. Cavanagh
> Clifford W. Taylor
> Marilyn Kelly
> Maura D. Corrigan
> Robert P. Young, Jr.

STATE OF MICHIGAN

SUPREME COURT

TAXPAYERS OF MICHIGAN AGAINST
CASINOS and LAURA BAIRD, State
Representative in her official capacity,

        Plaintiffs-Appellants,

v                              No. 129816

THE STATE OF MICHIGAN,

        Defendant-Appellee,

and

GAMING ENTERTAINMENT, LLC and
LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,

        Intervening Defendants-
        Appellees,

and

NORTH AMERICAN SPORTS
MANAGEMENT COMPANY,

        Intervening Defendant.

_____

TAXPAYERS OF MICHIGAN AGAINST
CASINOS and LAURA BAIRD, State
Representative in her official capacity,

        Plaintiffs-Appellees,

v                                          No. 129818

THE STATE OF MICHIGAN,

       Defendant-Appellant,

and

GAMING ENTERTAINMENT, LLC and
LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,

       Intervening Defendants-
       Appellees,

and


NORTH AMERICAN SPORTS
MANAGEMENT COMPANY,

       Intervening Defendant.

---

TAXPAYERS OF MICHIGAN AGAINST
CASINOS and LAURA BAIRD, State
Representative in her official capacity,

       Plaintiffs-Appellees,

v                                          No. 129822

THE STATE OF MICHIGAN,

       Defendant-Appellee,

and

GAMING ENTERTAINMENT, LLC,

2

Intervening Defendant-
Appellee,

and

LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,

Intervening Defendant-
Appellant,

and

NORTH AMERICAN SPORTS
MANAGEMENT COMPANY,

Intervening Defendant.

_____

WEAVER, J. (*dissenting*).

I dissent from the majority's decision holding that the amendatory provision in the compacts at issue, and the exercise of that provision by Governor Granholm, does not violate the Separation of Powers Clause, because the compact containing the amendatory provision was not properly enacted by a legislative bill and the Governor's exercise of the amendatory provision is outside the limits of the constitution. I would hold that the compacts are void because they are legislation, required to be enacted by bill. As a result, I would hold that the amendatory provisions contained within the compacts are also void.[1]

---

[1] See *Taxpayers of Michigan Against Casinos v Michigan*, 471 Mich 306, 353-354; 685 NW2d 221 (2004) (Weaver, J., concurring in part and dissenting in part).

ANALYSIS

Michigan's Constitution separates the powers of government: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2. The executive power is vested in the Governor, Const 1963, art 5, § 1, and the legislative power is vested in the Senate and the House of Representatives, Const 1963, art 4, § 1. The executive power is, first and foremost, the power to enforce the laws or to put the laws enacted by the Legislature into effect. *People ex rel Sutherland v Governor,* 29 Mich 320, 325 (1874); *People ex rel Attorney General v Holschuh,* 235 Mich 272, 275; 209 NW 158 (1926); 16A Am Jur 2d, Constitutional Law, § 258, p 165, and § 275, p 193.

The legislative power is the power to determine the interests of the public, to formulate legislative policy, and to create, alter, and repeal laws. *Id.* The Governor has no power to make laws. *People v Dettenthaler,* 118 Mich 595, 602; 77 NW 450 (1898). "[T]he executive branch may only apply the policy so fixed and determined [by the legislative branch], and may not itself determine matters of public policy, change the policy laid down by the legislature, or substitute its own policy for that of the legislature." 16 CJS, Constitutional Law, § 359, pp 599-600.

Binding the state to a compact with an Indian tribe involves determinations of public policy and the exercise of powers that are within the exclusive purview

4

of the Legislature. The compacts at issue in this case contain examples of policy decisions made for each of the seven issues recognized in 25 USC 2710(d)(3)(C)(i) through (vii). [2]

These compact provisions necessarily require fundamental policy choices that epitomize "legislative power." Decisions involving licensing, taxation, criminal and civil jurisdiction, and standards of operation and maintenance require a balancing of differing interests, a task the multimember, representative

---

[2] As allowed under 25 USC 2710(d)(3)(c)(i), tribal law and regulations, not state law, are applied to regulate gambling. But the compact applies state law, as amended, to the sale and regulation of alcoholic beverages encompassing certain areas. See § 10(A) of the compact. Under 25 USC 2710(d)(3)(c)(ii), the tribe, not the state, is given responsibility to administer and enforce the regulatory requirements. See Compact § 4(M)(1). As provided in 25 USC 2710(d)(3)(c) (iii), to allow state assessments to defray the costs of regulating gaming, the compact states that the tribe shall reimburse the state for the costs up to $50,000 it incurs in carrying out functions that are authorized within the compact. See Compact § 4(M)(5). Also, the compact states that the tribe must pay two percent of the "net win" at each casino derived from certain games to the county treasurer. See Compact § 18(A)(i). Under 25 USC 2710(d)(3)(c)(iv), the tribe could tax the gaming activity, but the compact does not allow such taxation. As allowed by 25 USC 2710(d)(3)(c)(v), the compact provides for dispute resolution procedures in the event there is a breach of contract. See Compact § 7. As allowed by 25 USC 2710(d)(3)(c)(vi), the compact includes standards for whom a tribe can license and hire in connection with gaming, Compact § 4(D), sets accounting standards the gaming operation must follow, Compact § 4(H), and stipulates that gaming equipment purchased by the tribe must meet the technical standards of the state of Nevada or the state of New Jersey, Compact § 6(A). Under 25 USC 2710(d)(3)(c)(vii), the compact addresses the "other subjects that are directly related to the operation of gaming activities" throughout the document. For example, it allows for additional class III games to be conducted through the agreement of the tribe and the state. Compact § 3(B). Also, the compact states that the tribe must purchase the spirits it sells at the gaming establishments from the

(continued…)

5

Legislature is entrusted to perform under the constitutional separation of powers. See *Saratoga Co Chamber of Commerce v Pataki,* 100 NY2d 801, 823; 766 NYS2d 654; 798 NE2d 1047 (2003).

The approval of a compact with an Indian tribe involves numerous policy decisions. The executive branch does not have the power to make those determinations of public interest and policy, but may only apply the policy as fixed and determined by the Legislature. I would hold that committing the state to the myriad policy choices inherent in negotiating a gaming compact constitutes a legislative function. Thus, the Governor did not have the authority to bind the state to a compact with an Indian tribe, as this Court wrongly concluded in *Taxpayers of Michigan Against Casinos v Michigan,* 471 Mich 306; 685 NW2d 221 (2004), and the Governor does not now have the power to unilaterally exercise the amendatory provisions contained within the compacts.

## CONCLUSION

I would hold that the power to bind the state to a compact with an Indian tribe is an exercise of the legislative power, and that the Legislature must exercise its power to bind the state by enacting a bill, not by passing a joint resolution. I conclude that the compacts are void and, accordingly, so are the amendatory

---

(continued…)

Michigan Liquor Control Commission and that it must purchase beer and wine

(continued…)

6

provisions contained within the compacts.  I would hold that the compacts are void and that the provisions that permit the Governor to amend the compacts are unconstitutional.

Elizabeth A. Weaver

---

(continued…)
from distributors licensed by the commission. Compact § 10(B).

STATE OF MICHIGAN

SUPREME COURT

TAXPAYERS OF MICHIGAN AGAINST
CASINOS and LAURA BAIRD, State
Representative in her official capacity,

      Plaintiffs-Appellants,

v                                        No. 129816

THE STATE OF MICHIGAN,

      Defendant-Appellee,

and

GAMING ENTERTAINMENT, LLC, and
LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,
      Intervening Defendants-
      Appellees,

and

NORTH AMERICAN SPORTS MANAGEMENT
COMPANY,
      Intervening Defendant.

_____

TAXPAYERS OF MICHIGAN AGAINST
CASINOS and LAURA BAIRD, State
Representative in her official capacity,
      Plaintiffs-Appellees,

v                                        No. 129818

THE STATE OF MICHIGAN,
     Defendant-Appellant,

and

GAMING ENTERTAINMENT, LLC and
LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,
     Intervening Defendants-Appellees,

and

NORTH AMERICAN SPORTS MANAGEMENT
COMPANY,
     Intervening Defendant.

_____

TAXPAYERS OF MICHIGAN AGAINST
CASINOS and LAURA BAIRD, State
Representative in her official capacity,
     Plaintiffs-Appellees,

v                                             No. 129822

THE STATE OF MICHIGAN,
     Defendant-Appellee,

and

GAMING ENTERTAINMENT, LLC,
     Intervening Defendant-Appellee,

and

LITTLE TRAVERSE BAY BANDS OF
ODAWA INDIANS,
     Intervening Defendant-Appellant,

and

2

NORTH AMERICAN SPORTS MANAGEMENT
COMPANY,
     Intervening Defendant.

_____

MARKMAN, J. (*dissenting*).

I respectfully dissent. The majority here expands the "casino exception" to representative government that it effectively established in *Taxpayers of Michigan Against Casinos v Michigan*, 471 Mich 306; 685 NW2d 221 (2004) (*TOMAC I*). Pursuant to this exception, in the realm of Indian casinos: (1) the Legislature may approve legislation by something other than the regular legislative process; (2) the Governor may enact the equivalent of legislation without the involvement of the Legislature; and (3) the Legislature may delegate its legislative power by authorizing the Governor to exercise this power without imposing adequate standards on its exercise. As I asserted in *TOMAC I*, the original ratification of the instant compact by legislative resolution did not conform to the constitutional requirements for the passage of legislation. Therefore, because this compact was unconstitutionally established, the 2003 amendments of the compact at issue are unconstitutional as well. Moreover, these amendments themselves constitute legislation, and their unilateral adoption by the Governor violates provisions of the Michigan Constitution that establish the procedures for the enactment of legislation. Const 1963, art 4, §§ 25, 26, and 33. Further, even if I accepted the rationale of the majority in *TOMAC I* that the compact did not constitute

3

legislation, I would still conclude that the Legislature's purported grant of power to the Governor to amend the compacts gives her amendatory authority without standards, and thereby violates the Separation of Powers Clause of the Michigan Constitution. Const 1963, art 3, § 2. The ultimate effect of the majority's decision is, in the realm of Indian casinos, to establish "government by contract" in lieu of "government by constitution," under which the Governor and the Legislature may circumvent the charter of this state through the formation of contracts with outside entities. This "government by contract" deprives the people of Michigan of the right to exercise self-government with regard to Indian casino policy by permitting the Governor to enact the equivalent of legislation, with little or no role for the people's elected representatives in the Legislature. For these reasons, I would affirm the judgment of the Court of Appeals.

## I. STATEMENT OF FACTS

In 1998, the state of Michigan and four Indian tribes entered into Indian gaming compacts to allow casino gaming on tribal land pursuant to the federal Indian Gaming Regulatory Act. 25 USC 2710(d)(1)(C). According to the compacts' terms, the compacts would take effect when House Concurrent Resolution 115 was adopted by the Michigan Legislature on December 10, 1998. In § 16, the compacts provide for their own amendment, stating:

> This Compact may be amended by mutual agreement between the Tribe and the State as follows:

4

(A) The Tribe or the State may propose amendments to the Compact by providing the other party with written notice of the proposed amendment as follows:

(i) The Tribe shall propose amendments pursuant to the notice provisions of this Compact by submitting the proposed amendments to the Governor who shall act for the State.

(ii) The State, acting through the Governor, shall propose amendments by submitting the proposed amendments to the Tribe pursuant to the notice provisions of this Compact.

\* \* \*

(B) The party receiving the proposed amendment shall advise the requesting party within thirty (30) days as follows:

(i) That the receiving party agrees to the proposed amendment; or

(ii) That the receiving party rejects the proposed amendment as submitted and agrees to meet concerning the subject of the proposed amendment.

This amendment process thus allows the Governor, acting on behalf of the state, to propose an amendment to the tribes, which the tribes may or may not accept. The tribes may also propose amendments to the Governor, who may accept or not accept the proposed amendments on behalf of the state. Although the Legislature initially ratified the compacts by resolution, the compacts exclude the Legislature from the amendment process.

In July 2003, the Governor consented to amendments that had been proposed by the Little Traverse Bay Bands of Odawa Indians (LTBB). These amendments alter several features of the original compact. First, the amendments allow the LTBB to create a second casino, subject to the approval of the local

5

government. Second, the amendments provide that the gambling age in the second casino would be 21, instead of 18 as in the tribe's first casino. Third, the duration of the compact is lengthened from 20 to 25 years from the date of the amendments. Fourth, the tribe would now make payments as directed by the Governor, and not directly to the Michigan Strategic Fund. Fifth, the percentage of the "net win" accorded to the state would be modified for the second casino. Sixth, if another tribe was permitted more than two casinos, the LTBB would be allowed to operate an equal number. Finally, the LTBB agreed to make payments to the state as long as the state did not permit the erection of new casinos within a specified ten-county area.

## II. *TOMAC I*

In *TOMAC I*, I dissented from the majority's decision to acquiesce to the approval of the compacts by resolution. I continue to believe that *TOMAC I* was wrongly decided. The compacts, in my judgment, constitute legislation under the test adopted by this Court in *Blank v Dep't of Corrections*, 462 Mich 103; 611 NW2d 530 (2000). Because they are legislation, the Legislature and the Governor were required to approve the compacts by the legislative process set forth in the constitution. This method was not followed. Accordingly, the first reason that the present amendments of the LTBB compact are unconstitutional is simply because the compact itself was never constitutionally enacted. Moreover, as I sought to explain in *TOMAC I*, the amendment procedure in the compacts violates the

6

Separation of Powers Clause, because this procedure allows the Governor to amend legislation.

In *TOMAC I*, the critical issue was whether the compacts themselves are legislation, and are thus subject to constitutional requirements for the enactment of legislation. In *Blank*, this Court adopted a four-factor test developed by the United States Supreme Court in *Immigration & Naturalization Service v Chadha*, 462 US 919; 103 S Ct 2764; 77 L Ed 2d 317 (1983), to determine whether governmental action constitutes legislation. I applied these factors in evaluating the compacts in *TOMAC I* and concluded that the compacts were legislation.[1] The four factors are

> (1) whether the compacts at issue "'had the purpose and effect of altering . . . legal rights, duties and relations of persons . . . outside the legislative branch,'" *Blank, supra* at 114; (2) whether the Governor's action in negotiating the compacts and the Legislature's resolution vote on the compacts supplanted legislative action; (3) whether the compacts involved determinations of policy; and (4) whether Michigan's Constitution explicitly authorizes the Legislature to approve these compacts by a resolution vote even if they otherwise constitute "legislation." [*TOMAC I, supra* at 378 (opinion by Markman, J.).]

---

[1] The majority rejects the application of the *Blank* framework, stating that "this Court already explained its position and addressed the flaws in Justice Markman's rationale in *TOMAC I, supra* at 318-333." *Ante* at 9 n 2. Indeed, the majority concluded in *TOMAC I* that the *Blank* framework was "not relevant because the compacts [did] not constitute legislation." *TOMAC I, supra* at 378 n 9 (opinion by Markman, J.). However, as I responded at the time, "the very point of utilizing the [*Blank*] framework is to determine *whether* the compacts constitute legislation." *Id*. (emphasis in original). The majority does not even purport to apply the *Blank* framework to the amendments to the compact.

7

For the reasons elaborated upon in *TOMAC I*, the compacts between the state and the tribes constitute legislation. Concerning the first *Blank* factor, the compacts alter the legal rights of persons outside the legislative branch, because Indian casino gaming was illegal in Michigan under state and federal law before the enactment of the compacts. Under 18 USC 1166(a), in the absence of a compact, "all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State." See *TOMAC I*, *supra* at 379-381. Because casino gaming would be illegal on Indian lands under this provision if state law prohibits such gaming, it was necessary in *TOMAC I* to determine whether Michigan law prohibits Indian casino gaming in the absence of a compact. In fact, Michigan law generally prohibits casino gaming. MCL 750.301. Casino gaming in Michigan is only allowed pursuant to the Michigan Gaming Control and Revenue Act, MCL 432.201 *et seq*., which does not apply to "[g]ambling on Native American land," MCL 432.203(2)(d). Further, under the Indian Gaming Regulatory Act, class III gaming,[2] like that allowed in this case, is lawful on Indian lands only if the gaming

---

[2] "[C]lass III gaming" is defined as "all forms of gaming that are not class I gaming or class II gaming." 25 USC 2703(8). "[C]lass I gaming" is defined as "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." 25 USC 2703(6). "[C]lass II gaming" is defined as "bingo" and "card games" that are either "explicitly authorized by the laws of the
(continued…)

is "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . ." 25 USC 2710(d)(1)(C). Therefore, under both federal and state law, casino gaming by these tribes would have been illegal in the absence of the compacts. Moreover, the compacts require local units of government either to create a local revenue sharing board to receive a percentage of tribal gaming profits or to pay for the additional municipal burdens created by the casinos, such as increased costs for public services. *TOMAC I*, *supra* at 382. Regardless of which option is chosen by local units, the compacts impose new duties on government. The compacts therefore alter the legal rights and duties of persons outside the legislative branch by permitting the tribes to operate casinos, and by requiring local units of government to undertake certain actions.

Concerning the second *Blank* factor, passage of the compacts by resolution supplanted legislative action. Because federal law dictates that state laws apply within Indian reservations in the absence of a compact, 18 USC 1166, the sole alternative method for allowing Indian gaming in this state would have been through an alteration of state law. As I earlier explained:

> [I]n the absence of a compact, if the Legislature wanted to make gambling on Indian land lawful, the only way it could do that would be by either changing the gambling laws that are generally

(continued…)

State" or "not explicitly prohibited by the laws of the State . . . . " 25 USC 2703(7)(A). However, class II gaming does not include "any banking card games, including baccarat, chemin de fer, or blackjack," or slot machines. 25 USC 2703(7)(B).

9

applicable within the state or by changing the reach of the [Michigan Gaming Control and Revenue Act]. Changing those laws would, it cannot seriously be disputed, require "legislation." [*TOMAC I, supra* at 384.]

With regard to the third *Blank* factor, enactment of the compacts involved numerous policy determinations, of which "the most significant . . . was the initial decision to make lawful what was otherwise unlawful-- casino gambling on the subject Indian lands." *Id*. at 385. Other considerations, including how many casinos to allow, what the gambling age should be, what percentage of "net win" the tribes should be required to pay to the state, whether to extend the state employment security act and workers' compensation benefits to casino workers, and who should enforce the rules and regulations of the compacts, are all significant policy decisions. *Id*.

Concerning the final *Blank* factor, the Michigan Constitution does not allow the passage of legislation by resolution, except in specified instances that were not relevant in *TOMAC I*.[3]

Because each of the *Blank* factors suggests that the Indian gaming compacts are legislation, I concluded in *TOMAC I* that the compacts must be approved by the regular constitutional process of enacting legislation.

Under the Michigan Constitution, "[a]ll legislation shall be by bill . . . ." Const 1963, art 4, § 22. The constitution requires that "[n]o bill shall become a

---

[3] See Const 1963, art 4, §§ 12, 13, and 37; art 5, § 2; art 6, § 25.

law without the concurrence of a majority of the members elected to and serving in each house." Const 1963, art 4, § 26. Once the Legislature approves a bill, it is then presented to the Governor. If the Governor signs the bill, the bill is enacted into law. Const 1963, art 4, § 33. If the Governor does not sign the bill, the Governor may return the bill to the Legislature with her objections. *Id*. The Legislature may enact the bill despite the Governor's objections if two-thirds of the members of each house vote for the bill. *Id*. If the Governor does not return the bill, and the Legislature continues in session, the bill "shall become law as if [the Governor] had signed it." *Id*. After a bill becomes law, the constitution specifies how a law may be amended: "The section or sections of the act altered or amended shall be re-enacted and published at length." Const 1963, art 4, § 25. Under these constitutional provisions, in order to enact legislation, a bill must be passed by both houses of the Legislature and then either approved by the Governor or, if vetoed, by two-thirds of each house of the Legislature. To amend a law once created, those sections amended must be reenacted by the same process.

Because the Legislature approved the compacts by resolution, and such compacts are legislation, the compacts were not validly approved under the constitution. By approving the compacts, the majority in *TOMAC I* established the first provision of the "casino exception" to representative government: the Legislature may approve an Indian gaming compact by resolution, and is not

11

required to abide by the regular legislative process established in the state constitution.

A second issue presented in *TOMAC I* concerned the constitutionality of the amendment provisions in the compacts. Although the Court in *TOMAC I* remanded this issue to the Court of Appeals, I addressed it because I believed that it was ripe for our consideration. Under the compacts, the Governor possesses amendatory authority; such authority allows the Governor, on behalf of the state, to unilaterally modify the compacts. However, as already noted, the Michigan Constitution requires that an amendment of legislation-- including an Indian gaming compact-- be effected through the reenactment of the pertinent sections of the statute. Const 1963, art 4, § 25. This reenactment must occur by the constitutional method for the passage of legislation. The exercise of the legislative power of amendment by the executive violates the provisions of the Michigan Constitution that establish the procedure for enacting and amending legislation, as well as the Separation of Powers Clause, which states: "The powers of government are divided into three branches: legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." Const 1963, art 3, § 2. Therefore, in *TOMAC I*, I would have held the amendatory provision of the compacts unconstitutional and would not have remanded to the Court of Appeals.

## III. 2003 AMENDMENTS AND *BLANK* FACTORS

At issue in this case are the 2003 amendments of the LTBB compact. Because the compact itself is unconstitutional, the amendments of the compact are unconstitutional. Moreover, under the *Blank* factors, the 2003 amendments themselves constitute legislation. The amendments alter the legal rights and duties of persons outside the legislative branch, they supplant legislative action, they involve determinations of public policy, and they are not authorized by the Michigan Constitution. Because these legislative acts were undertaken unilaterally by the Governor acting on behalf of the state, the enactment of these amendments violated multiple provisions of the Michigan Constitution.

## A. LEGAL RIGHTS AND DUTIES

The first *Blank* factor examines the effect of the amendments on the legal rights, duties, and relations of persons outside the legislative branch. The 2003 amendments alter the rights and relations of persons outside the legislative branch. The amendments allow a new casino to be built, which would not have been legal under state and federal law before the 2003 amendments.[4] As explained above, under 18 USC 1166, state law applies to casino gaming on Indian lands. Under

---

[4] Because the building of the second casino is "contingent on the approval of the affected local unit of State government (either city, village, or township)," § 2(F) of the amended LTBB compact, one might assert that the legal rights of the tribe have not been altered; that is, the LTBB has no "right" to build a second casino until the local unit of government approves the location of the casino.

(continued…)

13

MCL 750.301, such gaming is generally prohibited in Michigan. Although MCL 432.203(1) allows for gaming "conducted in accordance with this act," MCL 432.203(2)(d) states that the act does not apply to "[g]ambling on Native American land and land held in trust by the United States for a federally recognized Indian tribe on which gaming may be conducted under the Indian gaming regulatory act, Public Law 100-497, 102 Stat. 2467." Under MCL 432.203(2)(d), Indian casino gaming is not allowed on Indian land subject to the Indian Gaming Regulatory Act. Thus, by allowing another casino to be built by the LTBB, the amendments alter the legal rights of the LTBB, which now possesses a legal right to build a second casino without violating state law.

Moreover, the amendments extend the duration of the compact from 20 years to 25 years from the date of the amendments. Because the compact was effective in 1998, and the amendments became effective in 2003, the amendments will enable the LTBB to operate casinos for ten years longer than the original compact. From 2018 through 2028, the LTBB will be able to operate casinos, something it could not have done lawfully in the absence of the amendments.

Further, under the original compact, if certain criteria were met, the LTBB would no longer be required to make tribal gaming payments to the state. For example, if the state were to allow a person to operate commercial casino games,

---

(continued…)
However, the 2003 amendments of the compact ensure that the LTBB will face no
(continued…)

14

and that person was neither a federally recognized Indian tribe operating a casino pursuant to a compact nor a person operating a casino in Detroit pursuant to MCL 432.201 *et seq.*, then the tribe could cease making payments to the state. The 2003 amendments add additional criteria: under the amended compact, if the prior criteria apply, or if the state permits casinos to be built within ten specified counties, the tribe will no longer be bound to make payments to the state. Therefore, this amendment alters the legal duty of the tribe in terms of its gaming payment obligations.[5]

Because the 2003 amendments alter the legal rights and duties of persons outside the legislative branch in at least several ways, the first *Blank* factor indicates that the 2003 amendments constitute legislation.

## B. SUPPLANTING LEGISLATIVE ACTION

The second *Blank* factor considers whether the Governor's 2003 amendments of the compact supplant legislative action. Federal law requires a tribe to abide by state law in the absence of an Indian gaming compact. 18 USC 1166. As described above, Michigan law generally forbids the creation of new casinos unless allowed by statute. MCL 750.301; MCL 432.203. Thus, in the

---

(continued…)
opposition from the state of Michigan when it builds its second casino.

[5] The 2003 amendments also effect changes in the minimum gambling age and in the percentages of "net win" that must be paid to the state. These changes, however, only pertain to the second casino.

absence of an amendment of the Indian gaming compact, the LTBB could build a second casino only if Michigan law was changed through legislation.

Moreover, the amendments extend the period that the tribe may operate its casinos from 20 years to 25 years from the date of the amendments. As described earlier, casino gaming by the LTBB is only legal pursuant to its compact under the Indian Gaming Regulatory Act. In the absence of these amendments, it would have been illegal in Michigan for the tribe to operate casinos from 2018 to 2028, and the only way the tribe could operate casinos during that period would be through a change in Michigan law through legislation.

Indeed, MCL 432.203(5) suggests that casino gaming must be authorized by legislation, in the absence of a compact:

> If a federal court or agency rules or federal legislation is enacted that allows a state to regulate gambling on Native American land or land held in trust by the United States for a federally recognized Indian tribe, *the legislature shall enact legislation* creating a new act consistent with this act to regulate casinos that are operated on Native American land or land held in trust by the United States for a federally recognized Indian tribe. The legislation shall be passed by a simple majority of members elected to and serving in each house. [Emphasis added.]

Under current federal law, a state does not possess the right to regulate gambling on Native American land. *California v Cabazon Band of Mission Indians*, 480 US 202, 207; 107 S Ct 1083; 94 L Ed 2d 244 (1987); 25 USC 2710(d). However, in the event that federal law changes, MCL 432.203(5) requires the Legislature to

16

regulate Indian gaming through legislation.[6]  Thus, MCL 432.203(5) strongly suggests that the enactment of legislation is the authorized method for regulating Indian gaming in Michigan, *if* the state is accorded the power by federal law to regulate such gaming.

In the absence of the instant amendments, the building of a new casino and the ten-year extension of the period the LTBB may operate its casinos would only be permitted through legislation.  Thus, the amendments can fairly be said to supplant legislative action, indicating that the amendments also constitute legislation under the second *Blank* factor.

## C. POLICY DETERMINATIONS

The third *Blank* factor considers whether a governmental action involves "determinations of policy."  *Blank*, *supra* at 114 (opinion by Kelly, J.). Indisputably, the enactment of these amendments involved policy determinations of considerable and far-reaching consequence.  The clearest example of such a determination is obviously that the LTBB has been allowed to build a second

---

[6] The majority opines that MCL 432.203(5) is "irrelevant [to this case] because there *is* a compact . . . and the compact properly allows for amendments." *Ante* at 9 n 2 (emphasis in original).  The majority misapprehends my argument. Although I agree that MCL 432.203(5) is not *directly* applicable because federal law does not currently entrust regulation of Indian gaming to Michigan, the statute is nonetheless relevant.  The second *Blank* factor considers whether the action taken by the government would normally entail legislation.  Because MCL 432.203(5) indicates that regulation of Indian gaming would normally entail legislation, it contributes to the conclusion that the instant amendments supplant legislative action.

17

casino, and will be allowed to operate its existing casino for ten years longer than the original compact allowed. Presumably, the enlargement of casino operations must have been premised at least in part on a determination that casinos generally, and the LTBB casino in particular, have benefited the people of Michigan.

Such a determination is a policy determination of the sort routinely undertaken by the elected representatives of the people in the Legislature. Absent the "casino exception" to representative government, these legislators would be required to confront a wide range of questions implicated by the expansion of casino gaming in Michigan: whether the growth of casinos has adversely affected the social environment of the state and, if so, whether there are ways by which this can be ameliorated; whether any such adverse effect would be exacerbated by an increase in the number of casinos; whether casinos have benefited or harmed non-casino businesses in their communities; whether casinos have affected rates of personal and business bankruptcies; whether casinos have affected crime rates; whether casinos have resulted in the congestion of particular roads or otherwise affected state and local infrastructure; whether casinos have had an adverse effect on the quality of life in rural communities near casinos; whether casinos have harmed aspects of the environment; and whether casinos have adversely affected other tourist-related businesses within the state.

To confront these and other similar questions, legislators would normally seek out the views of their constituents and interested organizations, both through

committee hearings and through less formal means, and debate these matters with their colleagues. However, the result of the present amendment process for matters pertaining to Indian casinos is that such traditional decision-making, characteristic of a republican form of government, see US Const, art IV, § 4, has been replaced by unilateral decision-making on the part of a single person not part of the legislative branch. The third *Blank* factor thus also counsels in favor of finding that these amendments constitute legislation.

## D. MICHIGAN CONSTITUTION

The fourth *Blank* factor essentially examines whether the constitution authorizes an exception to the normal legislative processes, in this case permitting the Governor to undertake amendments of the law. Of course, the constitution neither states nor implies such an exception. Rather, it defines the Governor's power by simply stating, "The executive power is vested in the governor." Const 1963, art 5, § 1. With several very specific exceptions,[7] the constitution does not identify any traditionally legislative actions that the Governor may undertake, and I am aware of no inherent executive power within Michigan that allows the Governor to undertake such actions.

---

[7] See Const 1963, art 5, § 19, pertaining to the Governor's line-item veto authority, and Const 1963, art 5, § 2, enabling the Governor to reorganize the executive branch after the Legislature has organized the executive branch "by law."

19

Indeed, the constitution expressly sets forth the procedures for the amendment of legislation: "The section or sections of the act altered or amended *shall be re-enacted* and published at length." Const 1963, art 4, § 25 (emphasis added). Because the original LTBB compact constitutes legislation, the amendment of the LTBB compact could only occur through "reenactment," i.e., through legislation. As described above, the elaborate process for the enactment of legislation established in article 4 nowhere allows the Governor to reenact legislation on her own volition. Consequently, the Michigan Constitution does not grant the Governor the executive authority to amend Indian gaming compacts.

Nor does any other provision of the constitution grant the Governor the power to amend the compact absent involvement by the Legislature. The only arguably appropriate provision, as I discussed in *TOMAC I*, *supra* at 400-402, is Const 1963, art 3, § 5, which states:

> Subject to provisions of general law, this state or any political subdivision thereof, any governmental authority or any combination thereof may enter into agreements for the performance, financing or execution of their respective functions, with any one or more of the other states, the United States, the Dominion of Canada, or any political subdivision thereof unless otherwise provided in this constitution.

By its terms, this provision applies only to agreements with other states, the federal government, Canada, or any political subdivision of these. This provision does not refer to Indian tribes, and therefore the Governor does not appear to possess the authority under this provision to unilaterally enter into agreements

20

with Indian tribes, even with legislative authorization. See *TOMAC I*, *supra* at 400-402 (opinion by Markman, J.). Even supposing that this provision does allow the Governor to amend a compact with Indian tribes, such agreements are limited to "agreements for the performance, financing or execution of their respective functions," the latter presumably referring to the Governor's exercise of her authority as the chief executive of this state. Const 1963, art 3, § 5. As I stated in *TOMAC I*, *supra* at 402, "[T]he duty and power to set the parameters for casino gambling on land within Michigan's borders is not in any comprehensible sense a 'function' of the executive branch." The amendments at issue here-- extending the duration of the compacts, enabling a new casino, adjusting the gambling age for that casino, altering tribal gaming payments-- are not related in any coherent sense to the Governor's executive role. Because there is no constitutional warrant for the authority exercised here by the Governor, the fourth *Blank* factor also suggests that the amendments of the compact constitute legislation.

The *Blank* factors thus demonstrate, I believe, that the 2003 amendments constitute legislation. This conclusion accords with the decisions of other courts that have held that Indian gaming compacts constitute legislation. *State ex rel Clark v Johnson*, 120 NM 562, 573; 904 P2d 11 (1995) (holding that the governor's unilateral approval of an Indian gaming compact was "an attempt to create new law," in violation of New Mexico's separation of powers clause); *Saratoga Co Chamber of Commerce, Inc v Pataki*, 100 NY2d 801; 766 NYS2d

654; 798 NE2d 1047 (2003) (holding that approval of Indian gaming compact by the governor usurped the power of the legislature and violated the state constitution and the separation of powers doctrine); *Narragansett Indian Tribe of Rhode Island v State*, 667 A2d 280 (RI, 1995) (holding that the legislature, not the governor, has power to approve compacts under the state constitution); *Panzer v Doyle*, 271 Wis 2d 295, 338; 680 NW2d 666 (2004) (holding that "committing the state to policy choices negotiated in [Indian] gaming compacts constitutes a legislative function"), overruled in part on other grounds by *Dairyland Greyhound Park, Inc v Doyle*, 295 Wis 2d 1; 719 NW2d 408 (2006); *American Greyhound Racing, Inc v Hull*, 146 F Supp 2d 1012 (D Ariz, 2001) (holding that power to enter into Indian gaming compacts is "legislative"), vacated on other grounds 305 F3d 1015 (CA 9, 2002); *State ex rel Stephan v Finney*, 251 Kan 559; 836 P2d 1169 (1992) (holding that the power to bind the state to an Indian gaming compact is "legislative").

Because the amendments constitute legislation, they can only be effected by the procedures set forth in the constitution. As noted earlier with regard to amending a legislative act, Const 1963, art 4, § 25 requires the "section or sections of the act altered or amended" to be "re-enacted." Amendments to laws are therefore subject to the same procedural requirements as newly enacted laws.

The amendment process established in the LTBB compact violates this procedure. Instead of the Legislature originating a bill to amend the compact, the

22

Governor effected the amendments on her own authority. No bill was passed by the Legislature, and no bill was presented to the Governor. The process that was followed violated a variety of sections of the Michigan Constitution concerning how a bill becomes a law: Const 1963, art 4, §§ 25, 26, and 33. As a result, the Governor has exercised-- and the Legislature has allowed her to exercise-- powers granted solely to the Legislature.[8] Thus, the amendments violate the Separation of Powers Clause, Const 1963, art 3, § 2, which states: "No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution." By approving the Governor's exercise of amendatory power, the majority establishes the second provision of the "casino exception" to representative government: in the realm of Indian casinos, the Governor may enact the equivalent of legislation without the involvement of the Legislature.

The majority opinion, which permits the Governor to undertake legislative acts by contracting with the affected Indian tribe, may be aptly described as establishing, in the realm of Indian casinos, "government by contract" in lieu of "government by constitution." Pursuant to this, the Governor and the Legislature

---

[8] The Legislature's acquiescence in the enlargement of the Governor's power is irrelevant in assessing the propriety of this grant: "the acceptance by one branch of the expansion of the powers of another branch is not dispositive in whether a constitutional power has been properly exercised." *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 616; 684 NW2d 800 (2004).

may avoid restrictions, i.e., checks and balances, imposed under our "government by constitution," which provides that the Legislature alone may exercise "[t]he legislative power of the State of Michigan," Const 1963, art 4, § 1, and that the Governor may exercise only "[t]he executive power," Const 1963, art 5, § 1.

## IV. ACCEPTING THE PREMISE OF *TOMAC I*

Even accepting the premise of the majority in *TOMAC I* that the instant compact does not constitute legislation, I would still dissent. The amendment procedure in the LTBB compact improperly delegates the legislative power to contract to the Governor because the Legislature has failed to impose adequate standards on the Governor's exercise of that power.

As already noted, the Michigan Constitution grants the legislative power-- the entirety of it-- to the Legislature. Const 1963, art 4, § 1. The Legislature retains the general power to contract. See *TOMAC I*, *supra* at 328 ("[O]ur Legislature has the general power to contract unless there is a constitutional limitation."); *Advisory Opinion on Constitutionality of 1976 PA 240*, 400 Mich 311, 318; 254 NW2d 544 (1977). Here, the Legislature has authorized the Governor to carry out the contracting power through the amendment provision in the compact. Even if the compact as a whole had been validly approved by the Legislature under the rationale of *TOMAC I*, the Legislature was still required to have properly authorized the exercise of the contracting power in the amendment provision. If the exercise of the contracting power was improperly authorized,

24

then the Legislature essentially delegated its legislative power to the Governor and thereby violated the Separation of Powers Clause.

"Strictly speaking, there is *no* acceptable delegation of legislative power." *Mistretta v United States*, 488 US 361, 419; 109 S Ct 647; 102 L Ed 2d 714 (1989) (Scalia, J., dissenting) (emphasis in original). In determining whether a delegation of legislative power has occurred, the Court should inquire whether the Legislature has "authorize[d] the exercise of executive or judicial power without adequate standards." *Id*. Justice Scalia elaborated: "The focus of controversy . . . has been whether the *degree* of generality contained in the authorization for exercise of executive or judicial powers in a particular field is so unacceptably high as to *amount to* a delegation of legislative powers." *Id*. (emphasis in original). A determination whether the Legislature has improperly delegated legislative power to the Governor requires that this Court examine whether the authorization of amendatory power provides "adequate standards" for the Governor's exercise of amendatory power, and whether the "degree of generality . . . is so unacceptably high as to amount to a delegation of legislative powers." *Id.*

> "The true distinction . . . is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion *as to its execution*, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." [*Id.* at 418 (emphasis in original), quoting *Field v Clark*, 143 US 649, 693-694; 12 S Ct 495; 36 L Ed 294 (1892).]

This Court considered whether an authorization of executive power violated the principle of separation of powers in *Soap & Detergent Ass'n v Natural Resources Comm,* 415 Mich 728; 330 NW2d 346 (1982). *Soap & Detergent* considered a separation of powers challenge to the Governor's power to reorganize executive agencies. *Id*. at 751. Although the Governor possesses the power to reorganize under Const 1963, art 5, § 2, *Soap & Detergent* nonetheless characterized this power as a "legislative" power.[9] *Id*. After noting that the grant of power to the Governor under the constitution precluded a separation of powers claim, *Soap & Detergent* argued that inherent checks in Michigan's constitutional scheme barred the conclusion that the principle of separation of powers had been violated:

> Article 5, § 2, does not by any means vest "all" or any considerable legislative power in the executive. While it is true that broad legislative power has been delegated to the Governor to effectuate executive reorganization, this power is clearly limited. Three limitations must be emphasized. First, the area of executive exercise of legislative power is very limited and specific. Second, the executive branch is not the sole possessor of this power; the Legislature has concurrent power to transfer functions and powers of the executive agencies. Third, the Legislature is specifically granted the power to veto executive reorganization orders before they become law.

---

[9] It is axiomatic that when the constitution grants a specific power to the executive branch, that power becomes an "executive" power, however it might have been characterized in the absence of such a grant. Cf., e.g., Const 1963, art 3, § 8 (advisory opinions as part of the "judicial power" in Michigan). I cite *Soap & Detergent* here only because it illustrates the criteria for determining when a violation of the separation of powers occurs.

Therefore, the specific intent of the constitutional convention in fashioning art 5, § 2, having been to delegate a very limited and specific legislative power to the executive, and this provision having been adopted into the constitution with sufficient checks to restrain an improper exercise of this power, we find no constitutional infirmity negating the Governor's ability to transfer rulemaking authority from one agency to that agency's department head. [*Id.* at 752-753.]

Under *Soap & Detergent*, when one branch authorizes the use of power by another branch, the authorizing branch must provide "sufficient checks" on the exercise of power. Whether the Legislature has provided sufficient checks on the exercise of power depends on whether the authorization of power is "limited and specific," whether the branch authorizing the power retains concurrent power, and whether the branch authorizing the power may veto the decisions of the branch exercising the power.

Although I would prefer to cast this inquiry in terms of whether the power being conferred has, by the constraints placed upon its exercise, been effectively transformed from a power properly exercised by the grantor branch into a power properly exercised by the grantee branch, *Soap & Detergent* does identify important aspects of this analysis.

Although this Court has never before addressed an authorization of amendatory power in the context of Indian gaming compacts, the Wisconsin Supreme Court addressed a similar question in *Panzer v Doyle*, *supra*. In *Panzer*, the Wisconsin legislature had statutorily authorized the governor to enter into and amend compacts with Indian tribes. *Id.* at 303. "The delegation of power to a

27

sister branch of government must be scrutinized with heightened care to assure that the legislature retains control over the delegated power . . . ." *Id.* at 335. *Panzer* held that the Wisconsin legislature had properly authorized the governor to enter into Indian gaming compacts because the legislature retained "procedural safeguards" against the abuse of this power. *Id.* at 340-341. First, the legislature could repeal the statute enabling the governor to enter into Indian gaming compacts; second, the legislature could amend the statute to require that modifications be subject to legislative ratification; third, the governor would be held accountable for his actions at the ballot box. *Id.* at 341.

*Panzer* next addressed whether the legislature had properly authorized the governor to extend the duration of an Indian gaming compact indefinitely by later amendments of the compact entered into solely by the governor. *Id.* at 341-342. The governor had amended the compact to effectively prevent the state from rescinding the compact in the future, thereby rendering the duration of the compact indefinite. *Panzer* stated:

> We think it is extremely unlikely that, in the factual and legal atmosphere in which [Wis Stat] 14.035 was enacted, the legislature intended to make a delegation that could terminate its ability to make law in an important subject area. If such a far-reaching delegation were in fact intended, the delegation would be unconstitutional. [*Id.* at 347-348 (citation omitted).]

*Panzer* concluded that the Wisconsin legislature could not have authorized the governor to extend the duration of the compacts, even if it had intended to do so, because the legislature would lose all ability to control the power that it had

authorized the governor to wield. "The legislature would be powerless to alter the course of the state's position on Indian gaming" by changing state law. *Id*. at 345.

The authorization of the Governor's use of amendatory power in the LTBB compact constitutes a similar delegation of legislative power and hence violates the Separation of Powers Clause. Legislative power has been delegated here because the authorization of power does not impose "adequate standards" on the exercise of that power, and the "degree of generality . . . is so unacceptably high as to amount to a delegation of legislative powers." *Mistretta*, *supra* at 419 (Scalia, J., dissenting). The Legislature placed a single restriction on the Governor's ability to amend the compact: the Governor merely cannot expand the counties in which the LTBB may operate casinos. Beyond this stricture, the Governor possesses plenary authority, subject to no constraint beyond her own discretion, in the exercise of the contracting power. The compact imposes no limit on where or when the Governor may authorize new casinos. The compact imposes no limit on when or for how long the Governor may extend its duration. The compact imposes no procedural standards or obligations upon the Governor. For example, the Governor is not required to submit proposed amendments to the Legislature, to the affected local unit of government, or to any other governmental body, before enacting amendments of the compact. The compact contains no overarching standard to guide the Governor in her exercise of the amendatory power, not even one as general as those that have sustained delegations of power by the Congress

29

to federal administrative agencies, e.g., the Federal Communications Commission must regulate to promote the "public convenience, interest, or necessity . . . ." 47 USC 303. The LTBB compact contains *no* standard, broad or narrow, substantive or procedural, that would transform the legislative power being delegated into an executive power. Consequently, the authorization of the amendatory power constitutes an unconstitutional delegation of legislative power.

Thus, the majority establishes the third provision of the "casino exception": in the realm of Indian casinos, the Legislature may authorize the exercise of power without imposing any standard on the Governor's exercise of power, thereby effectively delegating legislative power to the Governor.

Moreover, *Soap & Detergent* directs this Court to consider whether the authorization of power is "limited and specific," whether the branch authorizing the power retains "concurrent power," and whether the branch authorizing the power "is specifically granted the power to veto" the other branch's exercise of that power. *Soap & Detergent*, *supra* at 752. None of these considerations alters the conclusion that the Governor here is exercising a legislative power. First, the authorization of the amendatory power is not "limited" or "specific." Pursuant to these amendments, the Governor has already allowed another casino and extended the duration of the compact for 25 years; there is nothing that precludes the Governor and her successors from allowing 50 or 100 casinos and extending the compact indefinitely. Second, unlike in *Soap & Detergent*, the Legislature here

30

does not retain any power to amend compacts with the LTBB. Third, the Legislature cannot thwart actions of the Governor by legislative veto. The Governor's ability to expand the scope of the compacts is plenary.

Moreover, under the rationale in *Panzer*, the Legislature should never be allowed to completely "terminate its ability to make law in an important subject area." *Panzer*, *supra* at 347. In this case, the Legislature has wholly ceded its ability to effect future amendments of the compact. The Legislature's acquiescence to the amendment procedure "terminate[d] its ability to make law in an important subject area." *Id*. Such acquiescence transforms both the legislative and executive powers of our state by precluding the Legislature in the future from reasserting its proper authority over both state contracting and Indian casinos. Rather, it will remain bound indefinitely by the actions of the Legislature in 1998.

The majority argues: (1) because the Legislature properly approved the compacts under *TOMAC I*, any amendment approved by the Governor pursuant to the amendment process would be permissible, but only as long as the amendment is "within the limits of the constitution," *ante* at 4, 9, and 14; (2) the Legislature acquiesced in the authorization of the Governor's exercise of amendatory power by approving the compacts by resolution; (3) the Legislature may properly confer amendatory authority on the Governor, citing *People ex rel Sutherland v Governor*, 29 Mich 320 (1874), and discretionary decisions made by the Governor pursuant to delegated authority are not reviewable by this Court, citing *People ex*

*rel Ayres v Bd of State Auditors*, 42 Mich 422; 4 NW 274 (1880); (4) the conferral of amendatory power on the Governor was "limited and specific," *Judicial Attorneys Ass'n v Michigan*, 459 Mich 291; 586 NW2d 894 (1998); and (5) the amendments "'[did] not impose new obligations'" on the people of Michigan because the amendments "'simply reflect the contractual terms agreed to by two sovereign entities.'" *Ante* at 11, quoting *TOMAC I*, supra at 327. I will briefly respond to these arguments.

First, the majority argues that the Legislature validly approved the amendment procedure in the compact, thereby "giv[ing] the Governor broad discretion-- within the limits of the constitution-- to amend the compacts." *Ante* at 9. However, this ignores that our constitution itself limits the methods by which the LTBB compact may be amended, by defining and limiting the powers of the three branches of government. An amendment procedure in violation of the separation of powers is made unconstitutional by Const 1963, art 3, § 2.

Second, the majority also argues that the Legislature acquiesced to the delegation of power to the Governor. While this may be true, it is this Court's obligation to uphold the constitution in service to the people, not in service to a particular branch of government. Moreover, it is our obligation to uphold the permanent interests of the separate branches, not those of its particular members at a particular moment in time. That one branch agrees to the exercise by another of an unconstitutional power does not mitigate the breach of the constitution. The

32

premise of a government of defined and limited constitutional powers is that the rights of "*we the people*" will most securely be maintained by this method. "The acceptance by one branch of the expansion of the powers of another branch is not dispositive in whether a constitutional power has been properly exercised." *Nat'l Wildlife Federation*, *supra* at 616.

Third, the majority contends that *Sutherland* allows the Legislature "to confer authority on the Governor." *Ante* at 10. It further contends that "discretionary decisions made by the Governor are not within this Court's purview to modify." *Ante* at 10, citing *Ayres*, *supra* at 426. Who could doubt either of these propositions? However, the relationship these propositions bear to the majority's conclusion that the Legislature may "confer authority" upon another branch of government *in any way or to any extent* the Legislature chooses is hard to comprehend. *Sutherland* did not assert that courts should be disinterested in the nature of the authority being conferred, and *Ayres* did not assert that all decisions made by a Governor were "discretionary." Indeed, neither *Sutherland* nor *Ayres* even addressed delegations of "legislative power" to the executive.[10] The

---

[10] In *Sutherland*, the Legislature had granted the Governor the discretion to issue certificates stating that a canal and harbor had been built in conformity with federal law. The dispute in *Sutherland* centered on whether this power was an "essentially executive" duty or a ministerial duty. *Sutherland, supra* at 329. In *Ayres*, the Legislature had authorized the Board of State Auditors to solicit contracts for the printing of Supreme Court reports. *Ayres* noted that "State officers inferior to the Governor have many duties which courts can compel them to perform . . ." *Ayers, supra* at 427. The dispute in *Ayres* was whether the Board

(continued…)

33

majority's casual assertion of governmental authority simply bears no resemblance to any traditional understanding of American constitutionalism.

Fourth, the majority invokes the test from *Judicial Attorneys Ass'n v Michigan* in support of its decision, but fails to properly apply that test. The majority states:

> An overlap or sharing of power may be permissible if "the grant of authority to one branch is limited and specific and does not create encroachment or aggrandizement of one branch at the expense of the other . . . ." [*Ante* at 7, quoting *Judicial Attorneys*, *supra* at 297.]

*Judicial Attorneys* concluded that a statute that allowed a local county to become the employer of judicial employees was not "limited and specific" and constituted an "aggrandizement" of the Legislature at the expense of the judicial branch. *Id.* at 301-303.[11] In the instant case, the Governor has been given the power to unilaterally amend the compact, constrained only by her inability to alter the definition of "eligible Indian lands." This near-plenary power is neither "limited"

---

(continued…)
of State Auditors could be compelled to perform its duties in a manner similar to an inferior officer.

[11] I dissented in part from the Court of Appeals opinion in the *Judicial Attorneys* cases and would have found that the Separation of Powers Clause was not violated. See *Detroit Mayor v Michigan*, 228 Mich App 386; 579 NW2d 378 (1998). I concluded that "any potential separation of powers concerns are not ripe for decision," *id.* at 427, and that the law in dispute "could be construed or applied in many ways, in many combinations and permutations, anticipated and unanticipated, some of which would engender no serious constitutional difficulties and others of which might be inconsistent with Const 1963, art 3, § 2 in whole or
(continued…)

nor "specific," and permits the "aggrandizement" of the executive branch at the expense of the legislative, which will play a sharply limited role in the formulation of Indian casino policy.

The majority further contends that the authorization of power in this case is limited by the "compacts themselves" and by the Governor's inability to "agree to an amendment that would violate the constitution or invade the Legislature's lawmaking function." *Ante* at 10 n 3. However, as already mentioned, there is only a single relatively insignificant limitation upon the Governor in the compact itself, and the majority apparently understands constitutional violations only in terms of substantive and not procedural terms. That is, while the Governor presumably could not set different minimum age limits for gambling in new casinos on the basis of race or nationality, the fact that she has exercised legislative power in this realm in the first place apparently does not implicate the constitution, no matter how much "aggrandizement" of one branch has occurred at the expense of another.

Finally, the majority concludes by saying, "[T]he amendments 'do not impose new obligations on the citizens of the state subject to the Legislature's power; they simply reflect the contractual terms agreed to by two sovereign entities.'" *Ante* at 11, quoting *TOMAC I*, *supra* at 327. The issue in the instant

---

(continued…)
in part." *Id*. at 439. This case is distinguishable in that the Governor's exercise of
(continued…)

case is not whether the 2003 amendments were agreed to by "two sovereign entities"; obviously they were.[12]  Rather, the issue is whether the procedure undertaken to approve the 2003 amendments complied with the requirements of our constitution.  Just as the United States cannot enter into a treaty with Belgium, and Michigan cannot enter into a compact with Ohio, by extra-constitutional procedures, neither can Michigan negotiate an Indian casino compact by extra-constitutional means.  The amendment procedure utilized here involves an unconstitutional delegation of legislative power to the Governor because it fails to provide "adequate standards"-- indeed it fails to provide any standards-- for the Governor's exercise of such power.  Such standards are necessary to transform a legislative power into an executive power.  The majority's conclusion that the amendments "'simply reflect the contractual terms agreed to by two sovereign entities'" is simply irrelevant to the necessary constitutional analysis.[13]

---

(continued…)
power engenders "serious constitutional difficulties" under all circumstances.

[12] See *TOMAC I*, *supra* at 397 ("I do not dispute that the compacts are akin to contracts of a unique nature.").

[13] The majority asserts that the contractual nature of the compact and the amendments is relevant because "'mutual assent'" is "'a characteristic that is not only the hallmark of a contractual agreement but is also absolutely foreign to the concept of legislating.'"  *Ante* at 11 n 4, quoting *TOMAC I*, *supra* at 324.  I do not disagree that the compact and its amendments are contractual.  Where I disagree is in the majority's assertion that, when acting pursuant to a contract, the Governor and the Legislature are no longer bound by the grants and limitations of authority set forth in our constitution.  The fundamental flaw in the majority opinion is that
(continued…)

Moreover, the majority's assertion that the amendments are not legislation because they "'do not impose new obligations on the citizens of the state'" simply ignores the reality that the citizens of this state are now obliged to admit a new casino and an indefinite number of future casinos into their communities, replete with the attendant economic and social consequences, without their elected representatives having had a voice in this determination. It is hard to conceive of a greater "obligation" being imposed upon a free citizenry than to be deprived of its ability to *effectively* communicate with its elected representatives.

## V. CONSEQUENCES OF MAJORITY OPINION

The separation of powers among our three branches of government is not an afterthought to our constitutional structure. "The framers of Michigan's Constitution understood well the importance of separating the powers of government." *46th Circuit Trial Court v Crawford Co*, 476 Mich 131, 141; 719 NW2d 553 (2006). "By separating the powers of government, the framers of the Michigan Constitution sought to disperse governmental power and thereby to limit its exercise." *Nat'l Wildlife Federation*, *supra* at 613. With regard to this state's Separation of Powers Clause, the official proposal at the Constitutional Convention stated:

---

(continued…)
it never explains why the LTBB contract should be permitted to prevail over the contract between the people and their government embodied in our constitution.

> The doctrine of the separation of powers prevents the collection of governmental powers into the hands of 1 man, thus protecting the rights of the people. It is as old as our American governmental system, and was devised by our founding fathers, greatly influenced by the French political theorist, Montesquieu. Desirous of protecting a free people, their idea was that if, somehow, the powers of government could be divided, it could not grow so large as to enslave them. [1 Official Record, Constitutional Convention 1961, at 601.]

In equally strong language, former Justice Cooley explained that the separation of powers "operates as a restraint upon such action of the [other branches of government] as might encroach on the rights and liberties of the people, and makes it possible to establish and enforce guaranties against attempts at tyranny." Cooley, *The General Principles of Constitutional Law in the United States of America* (Boston: Little, Brown & Co, 1880), p 43.

The majority allows the Governor, with the acquiescence of the Legislature, to circumvent the separation of powers principle embedded in Const 1963, art 3, § 2; art 4, § 1; art 5, § 1; and art 6, § 1. The grant of power from the Legislature in this case authorizes the Governor to enter into a *contract*. By some unexplained alchemy, such contract-- one authorized by constitutionally-designated officials in the legislative branch and one negotiated by a constitutionally-designated official in the executive branch-- is somehow permitted to trump a precedent contract that is part of the constitution. This precedent contract, entered into between "[w]e, the people of the State of Michigan" and its government, "ordain[ed] and establish[ed] *this* constitution." Const 1963, Preamble (emphasis added). "[T]his constitution"

38

sets forth an architecture and a process of government instituted for the "equal benefit, security and protection" of the people. Const 1963, art 1, § 1. Governmental officials are to operate within *these* constraints. Here, the majority allows these officials to act in disregard of constraints placed upon them by the constitution and thereby to impose new obligations upon the people.

As a result, a matter of public policy significance-- the nature of Indian gaming within this state-- is exempted from the regular processes of government. Through an improper delegation and exercise of legislative power, the Legislature has been deprived of its future authority to act on behalf of the people in this realm, the people have lost the effective opportunity to "instruct their representatives" in this same realm, Const 1963, art 1, § 3, and communities across the state have had diluted their ability to influence their local representatives in the law-making process in this realm. It is fair to describe the effect of the majority opinion, in conjunction with its opinion in *TOMAC I*, as the creation of a "casino exception" to representative government. Within the realm of the "casino exception," government is undertaken by contract rather than by regular constitutional processes, and public policy decisions normally within the contemplation of the legislative process are made by executive branch negotiators rather than by elected legislators.

Because of the majority opinion, the LTBB will be allowed to build a second casino in a second Michigan community, unburdened by the involvement

of the people's elected representatives in the Legislature.  Perhaps this will prove to be a wise judgment.  Perhaps the effect of these casinos-- as well as the effect of an unknown number of future casinos to be established by this same process over the next quarter-century-- will prove salutary.  Perhaps the effect of these and later casinos on traffic, the environment and pollution, nearby schools, rural lifestyles, the character of communities, levels of noise, rates of crime, the competitiveness of state and local businesses, the incidence of bankruptcies, and the moral and social fabric of our state will all turn out well.  Even if so, however, decisions such as these should be undertaken by the people through their elected representatives and not through the processes of the "casino exception" to representative government.  The result of the majority's approach will be that, in the realm of Indian casinos, the authority of the people will be eroded, local influence will be eroded, and self-government itself will be eroded.

## VI. CONCLUSION

In my judgment, the Governor's approval of the 2003 amendments violates the constitution, and the majority errs in affirming this action through what I view as the effective creation of a "casino exception" to representative government.  By this exception, the majority enables the following:

First, in the realm of Indian casinos, the majority allows the Legislature to approve legislation through something other than the regular legislative process established by the constitution, as in this case where the Legislature approved the

40

LTBB compact by a simple resolution vote. Because the compact constitutes legislation, it was unconstitutionally enacted in deviation from the regular legislative process. Consequently, the amendments of the compact are themselves unconstitutional.

Second, in the realm of Indian casinos, the Governor may enact the equivalent of legislation without the involvement of the Legislature, as in this case where the Governor has unilaterally approved amendments of the LTBB compact. Because the amendments of the compact themselves constitute legislation under the *Blank* factors, unilateral enactment of these amendments violated the provisions of our constitution that establish the procedure for the passage of legislation, Const 1963, art 4, §§ 25, 26, and 33, as well as the clauses pertaining to the separation of powers, Const 1963, art 3, § 2; art 4, § 1; art 5, § 1; art 6, § 1. Consequently, the amendments are unconstitutional.

Third, in the realm of Indian casinos, the Legislature may delegate legislative power without supplying an adequate standard for its exercise, as in this case where the Legislature delegated to the Governor amendatory power over the compact without specifying *any* standards for its exercise. Consequently, the compact unconstitutionally delegates legislative power, and the Governor's exercise of that power by enacting the 2003 amendments is unconstitutional.

The majority allows the Governor and the Legislature to act outside their authority and beyond the limitations of our constitution. As a result, in the realm

41

of Indian casinos, I believe that the authority of the people to exercise self-government will be diminished.  For these reasons, I respectfully dissent.

Stephen J. Markman